ESTATE OF EUIL S. SPRUILL, DECEASED, KATHLEEN SPRUILL MIERS AND WEYMAN E. SPRUILL, EXECUTORS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 33697-84, 16578-85,     Filed May 7, 1987.
16579-85.

---

[1]The following cases are consolidated herewith: Lewis J. Miers, Jr., and Kathleen S. Miers, docket No. 16578-85, and Weyman E. and Jennie Spruill, docket No. 16579-85.

1198

*Randolph W. Thrower*, *J. D. Fleming*, *Donald A. Winslow*, and *Michael J. Egan*, for the petitioners.

*Charles P. Hanfman* and *James S. Erie*, for the respondent.

FEATHERSTON, *Judge*: Respondent determined a deficiency in the amount of $13,570,174.98 in the estate tax for the Estate of Euil S. Spruill and an addition to tax under

section 6653(b)[2] in the amount of $6,785,087.49. Also, respondent determined deficiencies in the individual petitioners' 1981 Federal income taxes as follows:

| Petitioner | Deficiency |
|---|---|
| Weyman E. and Jennie Spruill............................ | $2,600,815.56 |
| Lewis J. Miers, Jr., and Kathleen S. Miers ................ | 2,616,954.34 |

The issues for decision are:

(1) Whether the Ashford-Dunwoody Farm (exclusive of two homesites thereon) is includable in decedent's gross estate under section 2033; the answer depends on whether a resulting trust arose in 1956 in favor of decedent's two adult children, who had remainder interests in the property, when they executed quitclaim deeds conveying their interests to decedent.

(2) Whether the homesite where decedent's daughter lived on the Ashford-Dunwoody Farm is includable in decedent's gross estate under section 2033; the answer depends on whether decedent's daughter and her husband retained their beneficial interest in the homesite when they conveyed it to decedent in 1961 in order to obtain a loan with which to pay decedent for the homesite.[3]

(3) Whether the homesite on which decedent's son lived on the Ashford-Dunwoody Farm is includable in decedent's gross estate under section 2033; the answer depends on whether decedent, within the meaning of section 2036(a)(1), retained the right to possession or enjoyment of the homesite for a period which did not, in fact, end before his death when he conveyed the homesite to his son in 1961.

(4) What was the fair market value of the Ashford-Dunwoody Farm includable in decedent's gross estate on October 5, 1980, the date of decedent's death.

___

[2] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise noted.

[3] Respondent issued "protective" notices of deficiency to the individual petitioners determining that the gain from the sale of the Ashford-Dunwoody Farm was not reported on their Federal income tax returns for 1981. The individual petitioners' liability for the income tax deficiencies depends on our conclusions as to whether or not the Ashford-Dunwoody Farm and Kathleen's homesite (issues 1 and 2, above) are includable in decedent's gross estate for purposes of the estate tax and the valuation of the farm (issue 4, above). All adjustments to the individual petitioners' income tax may be addressed in a computation pursuant to Rule 155.

(5) What was the fair market value of the River Farm, another piece of real estate includable in decedent's gross estate, on October 5, 1980, the date of decedent's death.

(6) Whether any part of the underpayment of estate tax of decedent's estate was due to fraud within the meaning of section 6653(b).

## FINDINGS OF FACT

### 1. *Background*

Euil S. Spruill (decedent) died on October 5, 1980. Under decedent's will, his two children, Weyman E. Spruill (Weyman) and Kathleen Spruill Miers (Kathleen), residents of Georgia, are the coexecutors of decedent's estate. A Federal estate tax return was timely filed on July 6, 1981, with the Internal Revenue Service Center, Atlanta, Georgia.

Until his retirement, Weyman had been a farmer all his life. After graduating from high school, with the exception of military service in World War II, Weyman worked full time for his father in farming and in a grading and landscaping business that decedent had begun in the mid-1930's to supplement the farm income.

After receiving her high school education, Kathleen began working as a bank teller. For 18 years prior to her retirement in 1978, Kathleen was employed at Citizens & Southern Bank first as a proof operator, then as a teller, and finally as a loan officer.

### 2. *Ashford-Dunwoody Farm*

Stephen T. Spruill (Stephen), decedent's father, purchased, between 1889 and 1910, all the real property encompassed in land lots 347 and 348 of the 18th district of DeKalb County, Georgia, north of Atlanta. In 1931, Stephen conveyed various parcels of this land to six of his nine children, including a deed of approximately 102 acres of farmland in lot 347 (102 acres) to decedent, decedent's wife, Georgia Spruill (Georgia), and decedent's children (1931 deed).

Under the 1931 deed, decedent was to receive the income from the property for the remainder of his life, but should he predecease his wife, Georgia, the income from the land would go to Georgia until she died or remarried. Upon the

termination of these life estates, the remainder of the property in fee simple was to go to decedent's children or to the descendants of any of decedent's children who did not survive the life estates, or, should decedent die without children or descendants, the property was to revert back to Stephen's estate.

The Ashford-Dunwoody Farm, one of the two subject properties, consists of approximately 41 acres located in the western half of the 102 acres covered by the 1931 deed. It borders on Ashford-Dunwoody Road to the west and on Interstate Highway 285 (I-285) to the south. The recorded deeds to decedent's brothers and sisters covering other parcels were similar in form to the 1931 deed given to decedent.

In the early 1930's, decedent and his family moved into a former tenant house located on the 102 acres. Decedent farmed the land over the years with the help of his son, Weyman.

In 1936, Stephen conveyed to decedent, for $855 consideration, approximately 102½ acres of land located in land lots 347 and 346, 18th district, DeKalb County, Georgia, lying immediately north of the above-described 102 acres.[4] This parcel of land was previously conveyed by Stephen to decedent's brother, Paul, who later sold the property to DeKalb County for taxes. Stephen purchased the land from the county and sold it to decedent, giving decedent a total of approximately 205 contiguous acres of farmland.

In 1948, and again in 1956, decedent's attorney was advised by the Atlanta Title Co. (title company) that a title insurance policy could not be obtained on either the 102 acres received by decedent under the 1931 deed or the land purchased by decedent in 1936 from his father. By letter dated July 26, 1956, the title company advised decedent's attorney that the 1931 deed created life estates in decedent and his wife, Georgia, vested remainder interests in decedent's children subject to being opened to include any after-born children, contingent remainder interests in decedent's grandchildren, and a reversionary interest in Stephen

---

[4]Stephen conveyed the 102½ acres of land to decedent by quitclaim deed dated Dec. 28, 1936, which was recorded on Mar. 24, 1937. On June 19, 1958, a deed was recorded correcting the property description on the original recorded deed.

or his estate. The title company suggested that most of the interests under the 1931 deed could be divested by conveyance, but the interests of decedent's unborn children could be disposed of only pursuant to a court action brought by decedent. The purpose of such an action would be to secure court authorization to sell or borrow on the land subject to reinvestment of the proceeds, thus protecting the contingent interests of the minor grandchildren and unborn children. See *Cooney v. Walton*, 151 Ga. 195, 106 S.E. 167 (1921).[5]

In September 1956, shortly after the title company rendered its opinion, decedent obtained quitclaim deeds from all adult family members who held any interest in the 102 acres under the 1931 deed: Weyman, Kathleen, Stephen, and Georgia. The quitclaim deed executed by Stephen and Georgia provides in part:

This instrument is executed by S.T. Spruill in order to convey to said E.S. Spruill all the right, title and interest which may now remain in S.T. Spruill, including any reversionary rights under the terms of * * * [the 1931] deed. Mrs. Georgia Spruill conveys all her interest in said property under the terms of said deed.

Each of the quitclaim deeds contains the following clause:

neither the said party of the first part [transferor] nor his heirs, nor any other person or persons claiming under him shall at any time, by any means or ways, have, claim or demand any right or title to the aforesaid described premises or appurtenances, or any rights thereof.

At the time, Weyman knew nothing about the legal incidents of a life estate, but expected that the land would come to him and Kathleen when their parents died. The nature of his interest under the 1931 deed had never been explained to him, and he had never seen the deed or discussed it with an attorney. Weyman signed the quitclaim deed without reading it, because his father told him to sign it.

---

[5] In *Cooney v. Walton*, 151 Ga. 195, 106 S.E. 167, 172 (1921), the Supreme Court of Georgia upheld the jurisdiction of a trial court in equity on petition of a life tenant in real property to authorize the sale of the property where the remainder interests were held by the testator's adult son and any unborn children of the son, and the proceeds were to be reinvested under the same limitations as provided in the will which created the life estate and remainder interests.

Kathleen and decedent spent little time reviewing the quitclaim deed she signed. She knew nothing of the interests of her children or the reversionary interest of her grandfather, Stephen, and had never read the 1931 deed.

On December 23, 1959, decedent filed a petition in the Superior Court of DeKalb County (Superior Court) seeking the court's permission to dispose of the 102 acres naming as defendants Polly Spruill, Molly Miers, and Roger Miers, decedent's then minor grandchildren and children of Weyman and Kathleen. The petition set forth the terms of the 1931 deed and alleged that Stephen, Georgia, Weyman, and Kathleen had each conveyed to decedent his or her entire interest in the 102 acres under the deed.

In the petition in the Superior Court, decedent requested that (1) the Superior Court appoint a guardian ad litem to represent the defendants (decedent's minor grandchildren) and any unborn children or grandchildren of decedent; (2) the Superior Court enter judgment authorizing the sale of the 102 acres; and (3) that decedent be permitted to reinvest the proceeds of such sale in "government bonds, building and loan associations, or other real property as may be approved by this Court." Decedent's petition for relief was granted by the Superior Court in a decree entered February 10, 1960, and was made binding on all persons interested in the property.

Beginning in 1960, in the years following the Superior Court's decree permitting decedent to sell or borrow on the 102 acres, decedent disposed of a large portion of the property. In June 1960, decedent received $25,263.33 in a condemnation proceeding for approximately 14.6 acres used for the construction of I-285. In November 1961, decedent exchanged a small corner piece of land on the west side of Ashford-Dunwoody Road for a small piece of frontage land on the east side of Ashford-Dunwoody Road belonging to decedent's brother, Carey T. Spruill (Carey). In June 1965, decedent sold a triangular strip of land south of I-285 for $10,250. In 1968, decedent sold 149.6 acres of land, including a large part of the 102 acres (east of the Ashford-Dunwoody Farm and adjacent to I-285) to a group of developers (including J. Michael Gearon and T. Harvey Mathis) for a stated purchase price of $2,169,055 (Gearon

sale). Decedent accepted as payment, cash, an installment note, and three parcels of property valued at $361,711.15, including a 191-acre farm in Fulton County, Georgia, purchased by the developers from Stephen's estate (River Farm). Decedent received additional amounts through condemnation proceedings in 1971.

In connection with the Gearon sale, Weyman signed an affidavit on January 17, 1969, stating the following with respect to property which included the 102 acres:

This deponent has been familiar with the history of the possession of said property over a period of 32 years and knows that throughout said period said property has been continuously used and occupied, personally, by said owners, and the predecessor in title of said owners, namely: Euil S. Spruill.

To deponent's knowledge, no other person or persons during said period have occupied or claimed any part of said property adversely to said owners and said predecessor in title.

Deponent further says that said possession has been open, notorious, continuous, exclusive, peaceable and uninterrupted throughout said period of time, and has been evidenced by the following specific acts or uses: Euil S. Spruill has cultivated all of said tract of land and fenced portions thereof in furtherance of the cultivation of the land and the raising of cattle thereon for 31 years from 1937 to 1968. Euil S. Spruill has dealt in all respects with all people as the sole owner of the property and resided on said property for 31 years from 1937 to 1968.

Decedent, on January 31, 1969, signed an affidavit which stated the following:

Deponent further says that he went into possession with a bona fide claim of right and title to all that land in Land Lot 347 [which includes the Ashford-Dunwoody Farm] of the 18th District of DeKalb County, Georgia; that deponent's possession was accompanied by a claim of right, did not originate in fraud, and was public, continuous, exclusive, uninterrupted, and peaceable, and has been evidenced by the following specific acts or uses: that deponent acquired the title to said property by two conveyances from deponent's father, S.T. Spruill. The first of said conveyances was deed dated January 2, 1931, recorded in Deed Book 344, page 140, of the DeKalb County Records, conveying 102 acres more or less, and the second was by deed dated March 22, 1937, recorded in Deed Book 451, page 14 of said records conveying 102½ acres, more or less, as corrected by deed dated May 8, 1958, recorded in Deed Book 1339, page 581, of said records. It was deponent's grantor's expressed intention to convey to deponent all of Land Lot 347 of the 18th District of DeKalb County, Georgia, and by the aforesaid conveyance deponent's grantor did convey to deponent all of Land Lot 347 of the 18th District of DeKalb County, Georgia. After the aforesaid 1931 and 1937 convey-

ances deponent lived on said lands conveyed by the above-mentioned deeds, cultivated said lands, and erected fences on various portions of said lands in furtherance of said cultivation and the raising of cattle thereon, all during the period from 1937 until 1968. Deponent Euil S. Spruill during said 31-year period of time dealt with agents of DeKalb County in his capacity as owner of said lands with respect to the widening of Ashford-Dunwoody Road, and conveyed property to DeKalb County for the widening of said road which forms the western boundary of said lands. Deponent has paid taxes on said lands from the year 1937 to date and has acted in all respects as the sole owner of said lands. The property described on Exhibit "A" * * * is a portion of said lands conveyed to deponent by the above-mentioned 1931 and 1937 deeds. Deponent states that said act of ownership were [sic] performed as to all of said property until the sale to owners of that portion of said land described in Exhibit "A" hereto. Deponent further states that he has continued to act and does now act in all respects as the owner of all of the lands described in said deeds, EXCEPT only that portion described in Exhibit "A" hereto, and conveyed to owners as aforesaid.

At the time of his death in 1980, decedent had disposed of all the acreage (102½ acres) he had purchased from Stephen and most of the 102 acres originally conveyed by the 1931 deed, except the Ashford-Dunwoody Farm.[6]

In his will executed on April 26, 1977, decedent specifically devised the 0.8695 acres on which Kathleen and her husband lived (Kathleen Miers Homesite) to Kathleen. Decedent further devised the River Farm property to Kathleen and Weyman to be divided into equal parcels, if possible, with Weyman receiving the parcel on which a new barn had been built. Decedent further directed that the remainder of his real property be sold by the executors and the net proceeds of the sale be divided equally between Weyman and Kathleen.

On decedent's estate tax return, the executors included in the gross estate the Ashford-Dunwoody Farm including the Kathleen Miers Homesite but excluding the 2.4421 acres on which Weyman and his wife, Jennie, lived (Weyman Spruill Homesite).

### 3. *Kathleen Miers Homesite*

In 1960, decedent and Weyman began constructing a home for Kathleen and her husband, Lewis, on 0.8695 acres

---

[6]The Ashford-Dunwoody Farm lies almost entirely within the 102 acres and land lot 347, except that small frontage piece lying along Ashford-Dunwoody Road which is part of land lot 348 and was acquired by decedent in the 1961 land exchange with his brother, Carey.

of the Ashford-Dunwoody Farm near Weyman's home.[7] Kathleen and Lewis were both employed elsewhere, but decedent consulted them regarding the building plans and conferred with them on decisions made in the course of constructing their home. Kathleen and Lewis moved into the new home in December 1960.

On April 17, 1961, decedent conveyed the homesite to Kathleen and Lewis for a stated consideration of $20,000. Lewis attempted to obtain mortgage financing on the newly constructed house but was unable to secure a $20,000 loan to pay decedent for the home. Lewis discussed this with decedent, and decedent later told Lewis and Kathleen that he could borrow the money from the Decatur Federal Savings & Loan Association (Decatur Federal). On April 9, 1962, Kathleen and Lewis deeded the home back to decedent for a stated consideration of $10 and other valuable consideration. Two days later, decedent gave a security deed of the property to Decatur Federal covering a loan of $20,000, repayable over 20 years.

Lewis and Kathleen made monthly mortgage payments to decedent, who in turn made payments to Decatur Federal. Decedent told Lewis to deduct the mortgage interest on his and Kathleen's income tax returns, which they did. This arrangement continued for 6 years until September 1968 when decedent told Lewis and Kathleen that no further payments were necessary. On several occasions, Kathleen asked decedent to deed the homesite back to her and Lewis, but decedent told her he would take care of it in his will.

### 4. *Weyman Spruill Homesite*

After Weyman returned from the service in World War II, decedent assisted Weyman in building a home for himself and his wife, Jennie, on a 2.4421-acre site adjoining decedent's homesite on the Ashford-Dunwoody Farm. The house was built in 2 years using lumber from trees on the site, $4,000 or $5,000 of Weyman's and Jennie's savings, and $13,000 to $18,000 of decedent's money. Weyman and

---

[7]Decedent had executed a warranty deed dated Jan. 20, 1959, to Kathleen and Lewis for a homesite located on the acreage previously belonging to decedent's brother, Paul. Decedent later suggested that a better homesite for Kathleen and Lewis would be on the Ashford-Dunwoody Farm near Weyman's home, and Kathleen and Lewis deeded the first site back to decedent on Aug. 13, 1959.

Jennie moved into the house in 1947 or 1948, although it was not completed until 1953.

In 1955, decedent secured plans to build a new home for himself and Georgia, and he and Weyman cleared decedent's old homesite, moved a portion of the old house to another location on the farm to be used as a barn, and staked out a new site for decedent's home.

Decedent and Georgia moved into Weyman's home, staying in the dining room and planning to live with Weyman and Jennie until their new home was completed. However, Georgia died on February 14, 1957, before the new home could be built. After Georgia died, Jennie kept decedent's financial books and records, wrote his checks and letters, and took care of his domestic needs such as cooking, cleaning, and laundering. Decedent suggested at one time that he build a home for himself, but Jennie and Weyman insisted that he continue to stay with them.

From the time the house was built until the early 1960's, Weyman worked for decedent on the farm and received $20 to $30 per week in wages, pursuant to an arrangement between them to repay decedent the funds he provided in constructing the house. On April 17, 1961, decedent transferred by warranty deed to Weyman, for $10 and other valuable consideration, the 2.4421 acres of land on the Ashford-Dunwoody Farm on which the house had been built. Decedent continued to live in the dining room of Weyman's home until his death in 1980. The Weyman Spruill Homesite was excluded from decedent's gross estate on the estate tax return.

## 5. *Valuation and Fraud Issue* [8]

### (A) *Ashford-Dunwoody Farm*

(1) *Background.*—On October 5, 1980, the date of decedent's death, the Ashford-Dunwoody Farm (exclusive of the homesites) consisted of a 38.4456-acre[9] tract of undevel-

---

[8]The trial of this case consumed 9 days and the record consists of the testimony of 35 witnesses and approximately 660 exhibits. To avoid repetition, we have included some factual material in the opinion portion and excluded it from our findings.

[9]The Ashford-Dunwoody Farm, including the homesites, consisted of 41.7572 acres. Because we conclude *infra* that the homesites are not part of decedent's gross estate, the term Ashford-Dunwoody Farm excludes the homesites for purposes of placing a value on the

oped farmland, roughly rectangular in shape, located at the northeast corner of the intersection of Ashford-Dunwoody Road and I-285 in DeKalb County, Georgia. The farm is situated in an unincorporated area of DeKalb County known as Perimeter Center, approximately 12 miles from downtown Atlanta. Perimeter Center has undergone extensive development since the late 1960's, and provides premium accommodations for office and retail-based commercial enterprises. At the time of decedent's death, it was considered by some to be equal or superior in this regard to any similar location in the metropolitan Atlanta area. Located in close proximity to the developed areas in Perimeter Center are some of the most desirable and economically stable neighborhoods in metropolitan Atlanta.

At the time of decedent's death, the Ashford-Dunwoody Farm was bordered on the east and north by a major suburban office park. Across Ashford-Dunwoody Road, which forms the eastern border of the property, lay Perimeter Mall, a major regional shopping center. Additional office parks and major freestanding buildings, including two multi-story hotels, were located in the immediate vicinity of the Ashford-Dunwoody Farm. On October 5, 1980, the Ashford-Dunwoody Farm was zoned for residential use. Attached to this opinion as an appendix is a map of the Ashford-Dunwoody Farm, showing its boundaries as well as the homesites of Weyman and Kathleen.

Historically, applications for rezoning from residential to office-institutional (O-I) in the Perimeter Center area have been met with staunch opposition from the area residents and homeowners associations. Many opponents of rezoning applications in the area were concerned with density, which refers to the ratio of building floor area (expressed in square feet) to land area, and height restrictions. Their concerns related to the visual obstruction caused by higher buildings, increased traffic, congestion, and a desire to maintain the residential character of the neighborhood to the extent possible. At the time of decedent's death, the average density obtained in zoning actions in DeKalb County was approximately 30 percent (or 12,600 square feet of building

property and consists of the remaining 38.4456 acres. The sale to the Hines Interests, described *infra*, covered the entire 41.7572 acres.

floor area per acre) and zoning ordinances required building height to be limited to 5 stories without a variance. The zoning application process, itself, would normally last anywhere from 2 months to 2 years, and some applicants were required to resort to litigation to resolve zoning disputes.

(2) *Estate Advisors.*—Shortly after decedent's death, the executors engaged Thomas O. Davis (Davis) and Ralph H. Birdsong, C.P.A. (Birdsong), as lawyer and accountant, respectively, for the estate. Davis had previously represented decedent, Stephen's estate, and other Spruill family members. Birdsong had prepared decedent's tax returns for approximately 15 years. Both Davis and Birdsong had extensive experience in estate administration, including the preparation and filing of estate tax returns. The executors relied on Davis to advise them on legal matters pertaining to decedent's estate and on Birdsong to prepare the estate tax return, and consistently followed their advice.

Davis recommended that the executors employ William P. Kenyon (Kenyon) to appraise the value of the four parcels of real estate in decedent's estate, including the Ashford-Dunwoody Farm, as of the date of decedent's death, and upon Davis' advice, the executors did so. Davis had previously engaged Kenyon to make a number of appraisals on behalf of other clients. During the course of his appraisal, Kenyon contacted Davis and Weyman to get accurate descriptions of the properties and have the property lines pointed out to him. Kenyon did not at any time discuss with Davis, Birdsong, or the executors any matter concerning the value of the properties.

In his appraisal report dated March 17, 1981, Kenyon appraised the value of the Ashford-Dunwoody Farm at $50,000 per acre ($1,975,000 for 39.5 acres).[10] Both Davis and Birdsong at all relevant times considered Kenyon's appraisal of the Ashford-Dunwoody Farm to be a good and fair appraisal of the property, and Davis told the executors his opinion of the appraisal.

In February 1981, the executors met with William H. Woodward (Woodward), a real estate broker who had previously been acquainted with decedent and involved in

[10]Kenyon's report also contained appraisals of the River Farm and two additional properties included in decedent's estate tax return.

the Gearon sale. After discussion, the executors orally agreed to engage Woodward as a real estate advisor to assist them in marketing the Ashford-Dunwoody Farm for a consulting fee of 2.5 percent of the sales price of any property sold. An employment contract was later drawn up and backdated to February 4, 1981.

(3) *Inquiries From Brokers and Developers.*—After decedent's death, the executors began to receive inquiries from brokers and other interested parties about their interest in selling all ·or a part of the Ashford-Dunwoody Farm. Weyman and Kathleen told one another about the inquiries each had received, and Kathleen kept a list of the contacts. They agreed between themselves to give all inquirers the same response, namely, that they had not yet decided what they were going to do about selling the land but would advise them when and if a decision was made. Davis informed the executors of the inquiries he received about selling the Ashford-Dunwoody Farm.

On March 10, 1981, Malcolm Powell, a land developer and personal friend of the executors, presented to the executors a written offer to buy the Ashford-Dunwoody Farm, including the two homesites, for $5,950,000 ($140,000 per acre for 42.5 acres). The contract to purchase was conditioned on the property's being rezoned O-I at the purchaser's application. The executors returned the contract to Powell and explained that they were not accepting contracts on the property at that time.[11]

In May or early June 1981, after Woodward had fulfilled a prior commitment and could turn his attention to the executors, Kathleen provided Woodward with her list of contacts that had been made with her and Weyman regarding the sale of the Ashford-Dunwoody Farm and correspondence they had received from interested parties. At this time Woodward reviewed with both Weyman and Kathleen the results of his studies of the sales of properties comparable to the Ashford-Dunwoody Farm. The results

---

[11]In an interview with the Government's special agent on Mar. 31, 1982, Weyman stated that he did not recall having received an offer on the Ashford-Dunwoody Farm, and when asked specifically about the Powell offer, replied that it was for $45,000 to $50,000 per acre. Kathleen stated in the interview that she recalled the Powell offer at a price of $37,000 per acre but recalled at trial the price of $140,000. At trial, neither Weyman nor Kathleen denied making these statements to the special agent and testified that because the offer had been made prematurely, neither executor had read the offer word for word.

were prepared for the purpose of advising the executors as to the price they might expect to get for their land contingent on rezoning, and revealed land sales prices ranging up to $190,000 per acre, subject to zoning in the Perimeter Center area, and higher, in other areas north of Atlanta, for property already zoned. (See note 26 *infra.*) In response to this information, Kathleen advised Woodward that they would not be willing to take less than $235,000 per acre subject to zoning.

(4) *The "Party Line."*—Woodward and the executors met with Davis and Birdsong on June 3, 1981 (June 3 meeting), where it was agreed that Woodward would begin making personal contacts with brokers and prospective purchasers who had previously contacted them. Woodward was to issue the following statement (the so-called party line) to all interested parties:

Property not for sale. There has been continuous heavy pressure from brokers and qualified institutional investors. Tax considerations dictate heirs may be able to look at an unsolicited offer to purchase around 7/10/81,[12] however they will not seek an offer nor name a price. Heirs fully aware of land values, are not compelled to sell. Subject to counsel may be in position to sign contract late Oct. or early Nov. 81.

My personal judgment of value ranges between $200,000/ac. recent sales in area and $350,000 to $400,000/ac. Piedmont Road and Peachtree Road area. Terms would most likely be cash. (Obvious need of institutional investor) If subject to rezoning there should be a stiff penalty for failure. In event of several equal acceptable offers, acceptance would probably be made based on a. past track record of development and quality, b. ability to achieve zoning, c. heirs want development they would be proud of and an asset to the community. This is homeplace.

Woodward was to first contact Taylor and Mathis, a real estate development and brokerage firm, at least in part because the executors initially believed that Taylor and Mathis had a right of first refusal on the Ashford-Dunwoody Farm.[13]

Also at the June 3 meeting, Birdsong advised the executors of the approximate amount of the estate tax

---

[12]Later changed to 8/10/81.

[13]In 1967, decedent had given Michael Gearon a letter of first refusal on the Ashford-Dunwoody Farm pursuant to the Gearon sale. Taylor and Mathis bought out Michael Gearon in 1973, and thereafter owned the approximately 150 acres bordering the Ashford-Dunwoody Farm on the north and east. Although the executors initially thought that Taylor and Mathis had a legal right of first refusal on the property, Davis later advised them that the right was not a binding one.

liability, and the final decision to sell the Ashford-Dunwoody Farm was made.

On June 8, 1981, Woodward sent Davis a list of potential purchasers and those individuals who had contacted him, the executors, or Davis expressing interest in the Ashford-Dunwoody Farm. On June 15, 1981, Woodward met with representatives of Taylor and Mathis and presented the party line. Between that time and July 6, 1981 (the date the estate tax return was filed), Woodward contacted at least 25 to 30 potential purchasers and repeated the party line. Woodward kept detailed notes of these contacts and gave the executors copies of all his notes regarding various contacts and communications on the Ashford-Dunwoody Farm.

By mid-July 1981, following negotiations, the executors had decided that they would accept an offer from Taylor and Mathis for $275,000 per acre, contingent on acceptable terms on rezoning. An offer at that price was submitted but in late July, before the terms were agreed upon, the parties received a report from a responsible buyer of an interest at a higher price.

(5) *Sale of the Ashford-Dunwoody Farm.*—In late September 1981, the executors, acting with the advice of their advisors, invited the responsible prospects to submit sealed bids for the purchase of the property, including the two homesites. Enclosed with the invitation for bids was a fully prepared contract with provisions for the bidder to enter only the price per acre, not to be less than $350,000, and sign its name. The contract provided for a sale of the property "as is" (no contingency for zoning) and a substantial portion of the purchase price to be paid into escrow to ensure sufficient funds to pay estate taxes.

Four contracts were received in response to the invitation. One of those was submitted subject to conditions and was withdrawn before the day set for opening bids. The second bid, made by a partnership acting for W.B. Johnson Properties, was at a price of $350,000 per acre or an escalating price from $375,000 to $450,000 per acre, conditioned on the density obtained in rezoning. This bidder modified several provisions of the proposed contract, including an added provision for payment on terms not meeting

the requirements of the invitation. The third bid was for a price of $366,404 per acre, but included numerous modifications to the contract, including a closing date 9 months later than that specified in the invitation. Gerald D. Hines Interests of Houston, Texas (Hines Interests), entered an unconditional bid of $505,000 per acre, which was accepted on November 3, 1981. The sale of the Ashford-Dunwoody Farm to the Hines Interests was closed on December 1, 1981.

The first hearing before the DeKalb County Board of Commissioners (board) on the rezoning application filed by the Hines Interests with respect to the Ashford-Dunwoody Farm was held on May 25, 1982. Members of the community appeared at the meeting and expressed concern about the density levels requested by the Hines Interests. The Hines Interests had applied for rezoning to O-I and requested a density level in excess of 40,000 square feet per acre, more than 3 times the then prevailing average density of 12,600 square feet per acre. Although the DeKalb County Planning Department had recommended that the Hines Interests' rezoning application be granted, the board granted the requested rezoning to O-I but not at the requested density. Before their application was approved for a density in excess of 40,000 square feet per acre in August 1982, the Hines Interests filed suit to obtain the desired zoning and incurred unforeseen costs as a result of the delay.

(6) *Examination of the Estate Tax Return.*—The executors filed decedent's estate tax return on July 6, 1981, and reported the value of the Ashford-Dunwoody Farm in the return as $50,000 per acre ($1,975,000 for 39.5 acres)[14] based on Kenyon's appraisal whose report was attached to the return. The executors applied for an extension of time to pay estate taxes based on insufficient cash funds in the estate with which to pay the tax, and their application was approved. Both Davis and Birdsong anticipated that the estate tax return would be examined by the Internal

---

[14]The Kathleen Miers Homesite was included with the Ashford-Dunwoody Farm in decedent's gross estate, and the parcels were valued together for purposes of the estate tax return. The acreage of the two parcels was approximated at 39.5 acres.

Revenue Service and, before the return was filed, Davis so advised the executors.

Following the acceptance of the Hines Interests' contract, Davis recommended that the sale be reported immediately to the IRS to obtain an early determination. Birdsong responded that he did not believe such a report to be necessary as he understood that the examination had already begun. Davis and Birdsong agreed that if the examination had not begun by January 1, 1982, Davis would contact the IRS gift and estate tax office in Atlanta.

The executors and their advisors became aware that an examination had begun when Woodward was visited by examining agents on December 10, 1981. During the IRS examination of the estate tax return, Davis made his files available to the examining agents, with the executors' approval, and advised Woodward and Birdsong to do the same. Following Davis' advice, Birdsong and Woodward turned over to the examining agent all their papers relating to decedent's estate.

Upon referral from the estate and gift tax division which was conducting the examination of decedent's estate tax return, the IRS special agent began a criminal investigation of Woodward, Kenyon, Birdsong, Davis, and the executors. Following his investigation, the special agent recommended criminal prosecution of Weyman and Kathleen for submitting a false and fraudulent estate tax return under section 7206(1) and prosecution of Davis and Birdsong for aiding and assisting in the preparation of a false and fraudulent estate tax return under section 7206(2). The special agent also recommended prosecution of Davis, Birdsong, and the executors for conspiracy to defraud the IRS by submitting a false and fraudulent estate tax return; however, the Department of Justice declined to prosecute the executors and their advisors on any charge.[15]

Respondent determined that the value of the Ashford-Dunwoody Farm on the date of decedent's death was $505,000 per acre ($19,854,125.50 for 39.3151 acres).[16]

---

[15]Although they were originally subjects of the special agent's criminal investigation, Woodward and Kenyon were not recommended to the Department of Justice for criminal prosecution.

[16]39.3151 acres represents the exact combined acreage of the Ashford-Dunwoody Farm (38.4456 acres) and the Kathleen Miers Homesite (.8695 acres).

**(B)** *River Farm*

On October 5, 1980, the date of decedent's death, the River Farm consisted of a 190.77-acre tract of undeveloped farmland fronting on Old Alabama Road and the Chattahoochee River in Fulton County, Georgia. Approximately 40 to 50 percent of the land lay in a flood plain on which building was restricted. The River Farm was zoned for agricultural use and improved only with a metal hay storage barn. The area surrounding the property was primarily rural.

The River Farm was valued in the estate tax return at $668,000 (approximately $3,500 per acre) based on Kenyon's appraisal which was attached to the return. Respondent determined that the value of the River Farm on the date of decedent's death was $953,850 ($5,000 per acre).

### ULTIMATE FINDINGS OF FACT

(1) When the quitclaim deeds were executed, there was no mutual understanding between decedent, the grantee, and Weyman and Kathleen, the grantors, that decedent was to take only legal title while Weyman and Kathleen were to retain their beneficial remainder interests in the Ashford-Dunwoody Farm.

(2) There was a mutual understanding between decedent and Kathleen when she and her husband deeded her homesite back to decedent that decedent was to have mere legal title and she and her husband were to retain the beneficial ownership of the homesite.

(3) When decedent transferred to Weyman the deed to Weyman's homesite, no implied agreement or understanding existed between them that decedent retain possession or enjoyment of the homesite for his life or for a period which did not end before his death.

(4) A successful rezoning of the Ashford-Dunwoody Farm to O-I with a density of 30 percent (or 12,600 square feet per acre) was reasonably foreseeable on October 5, 1980, the date of decedent's death.

(5) Neither the purchase of the Ashford-Dunwoody Farm by the Hines Interests or any other purchases for a price approaching $505,000 per acre "as is" nor its rezoning to

the density ultimately obtained by the Hines Interests was reasonably foreseeable on October 5, 1980.

(6) On October 5, 1980, the fair market value of the Ashford-Dunwoody Farm was $7,304,664 ($190,000 per acre × 38.4456 acres).

(7) On October 5, 1980, the fair market value of the River Farm was $668,000.

(8) The record does not clearly and convincingly show that any part of the estate tax was due to fraud within the meaning of section 6653(b).

## OPINION

### 1. *Life Estate Issue*

Section 2033 provides that "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Petitioners contend that the Ashford-Dunwoody Farm and the Kathleen Miers Homesite are not includable in decedent's gross estate under section 2033 because the only beneficial interest in the property decedent had at his death was a life estate under the 1931 deed which terminated upon his death. Petitioners contend that in 1956 when Weyman and Kathleen signed the quitclaim deeds on the 102 acres, including the Ashford-Dunwoody Farm, an implied resulting trust arose in their favor whereby decedent, as trustee, held only legal title but no beneficial interest in the remainder of the property.

The law of the State of Georgia is applicable in determining what interest decedent had in the Ashford-Dunwoody Farm on the date of his death. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967); *Morgan v. Commissioner*, 309 U.S. 78, 80-81 (1940); *Ward v. Commissioner*, 87 T.C. 78, 92 (1986). Georgia statutory law provides (Ga. Code Ann. sec. 53-12-22 (Michie 1982)):

53-12-22. Distinction between express and implied trusts.

Trusts are either express or implied. Express trusts are those trusts created and manifested by agreement of the parties. Implied trusts are those trusts which are inferred by law from the nature of the transaction or the conduct of the parties.

The circumstances in which an implied trust may be found are outlined in Ga. Code Ann. sec. 53-12-26 (Michie 1982):

53-12-26. Events and conditions giving rise to implied trust.

A trust is implied:

(1) Whenever the legal title is in one person but the beneficial interest, either from the payment of the purchase money or from other circumstances, is either wholly or partially in another;

(2) Where, from any fraud, one person obtains the title to property which rightly belongs to another;

(3) Where, from the nature of the transaction, it is manifest that it was the intention of the parties that the person taking the legal title should have no beneficial interest; * * * [17]

Implied trusts arising under the first and third classifications in the above statute are considered resulting trusts, while those arising under the second classification are considered constructive trusts. *Hancock v. Hancock*, 205 Ga. 684, 54 S.E.2d 385, 389 (1949).

Implied resulting trusts arise from circumstances which indicate the parties' mutual intent to create a trust. *Hall v. Higgison*, 222 Ga. 373, 149 S.E.2d 808, 810 (1966). The Georgia Supreme Court has stated the following principle (*Harrell v. Harrell*, 249 Ga. 170, 290 S.E.2d 906, 907 (1982)):

circumstances may be offered as evidence of an intention (whether or not expressly articulated by each party) that title shall vest in one and beneficial ownership in the other. The scope of such evidence includes all of the facts and circumstances surrounding the transaction. The ultimate inquiry is whether there was, in truth, a mutual understanding, *not* whether such an understanding was expressed in plain and unambiguous terms.

This mutual understanding must be shown to have existed at the time the transaction was consummated; in this case, the evidence must show that the mutual understanding existed in 1956 when Weyman and Kathleen executed the quitclaim deeds. *Fowler v. Montgomery*, 254 Ga. 118, 326 S.E.2d 765, 767 (1985); see also *Adderholt v. Adderholt*, 240 Ga. 626, 242 S.E.2d 11, 14 (1978); *Rigby v. Powell*, 236 Ga. 687, 225 S.E.2d 48, 50 (1976); *Whitworth v. Whitworth*, 233 Ga. 53, 210 S.E.2d 9, 13 (1974); *Williams v. Thomas*, 200

---

[17]The statute further provides (Ga. Code Ann. sec. 53-12-26(4) (1982)) that an implied trust will arise in favor of the grantor where an express trust has failed. As petitioners do not assert the existence of an express trust, this classification is not relevant to our discussion.

Ga. 767, 38 S.E.2d 603, 608 (1946). The inquiry is a factual one, and petitioner has the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.

## (A) *Ashford-Dunwoody Farm*

Based on our examination of the facts and circumstances in the record, we find that petitioners have failed to establish that Kathleen, Weyman, and decedent in 1956 shared a mutual understanding that a resulting trust existed in favor of Weyman and Kathleen.[18] In September 1956, decedent asked Weyman and Kathleen to sign quitclaim deeds on the 102 acres, including the Ashford-Dunwoody Farm, so that he could have good title to sell some of the property. Weyman and Kathleen, at their father's request, signed the quitclaim deeds which provided that neither Kathleen nor Weyman, nor their heirs or others claiming under them, shall "claim or demand any right or title" to the 102 acres. In signing the quitclaim deeds which include the above language, Weyman and Kathleen manifested their intent to convey to their father all present and future claims of ownership in the property.

Petitioners contend, however, that the facts and circumstances surrounding the transaction demonstrate that despite the language of the conveyance in the quitclaim deeds, the parties intended that decedent would have his life estate but would take only legal title to the remainder interest in

---

[18]The parties dispute the quantum of proof required to establish a resulting trust under Georgia law. Respondent argues that petitioners must prove the existence of a resulting trust by clear and convincing evidence, citing Ga. Code Ann. sec. 53-12-28 (1982), which provides:

"As between husband and wife, parent and child, and brothers and sisters, when one pays the purchase money for property and causes the conveyance to be made to the other, a gift shall be presumed. However, a resulting trust in favor of the one paying the money may be shown and the presumption rebutted."

The proof required to rebut the presumption of a gift under the above section is clear and convincing. *Ashbaugh v. Ashbaugh*, 222 Ga. 811, 152 S.E.2d 888, 892 (1966); *Williams v. Thomas*, 200 Ga. 767, 38 S.E.2d 603, 607 (1946). Petitioners argue, however, that the presumption of a gift in family transactions arises only in the "purchase money" context, unlike the instant circumstances, and that in any event petitioners should not be held to a higher standard of proof than is generally applicable in this Court, a preponderance of the evidence. We do not find it necessary to resolve this issue as petitioners have failed to provide sufficient evidence establishing the existence of a resulting trust as to the Ashford-Dunwoody Farm (exclusive of the homesites) under either the clear and convincing or preponderance of the evidence standard. *Ward v. Commissioner*, 87 T.C. 78, 93 n. 4 (1986).

the 102 acres.[19] The record facts do not show such an intention.

In 1956 decedent requested and obtained quitclaim deeds from all adult family members who held any interest in the 102 acres under the 1931 deed: Weyman, Kathleen, Stephen, and Georgia. When he found that he still did not have clear title to sell or borrow on the 102 acres, decedent filed an action in the Superior Court to obtain a decree allowing him to dispose of the 102 acres despite any contingent or remainder interests in the property. Decedent alleged in his petition that Weyman, Kathleen, Stephen, and Georgia had conveyed to him all their interest in the property and attached as exhibits copies of the quitclaim deeds. Decedent asked that the court permit him to reinvest proceeds from the sale of the 102 acres in other property "as may be approved by this Court."

Nothing in decedent's petition to the Superior Court reflects an understanding that Kathleen and Weyman had retained beneficial ownership of their remainder interest in the 102 acres. Rather, decedent alleged that all interest held by Kathleen and Weyman had been conveyed to him. Furthermore, decedent did not subsequently request approval from the Superior Court to reinvest any of the proceeds from the sale of portions of the 102 acres in accordance with his prayer for relief. Moreover, decedent made no accounting of the sale proceeds and reinvestment thereof to Kathleen and Weyman or to the guardian ad litem appointed for the contingent remaindermen under the court's decree. Nor is there evidence that decedent kept such records.

After decedent obtained clear title to the 102 acres, he consistently dealt with the property as his own. In 1960, decedent received funds in a condemnation proceeding for part of the 102 acres used for the construction of I-285. As detailed in our findings, on April 17, 1961, he deeded 0.8695 acres to Lewis and Kathleen and 2.4421 acres to Weyman. On November 16, 1961, decedent exchanged part of the 102 acres west of Ashford-Dunwoody Road for Carey's land east

---

[19]The parties do not dispute that petitioners may introduce parol evidence tending to show that a deed was impressed with a resulting trust. Ga. Code Ann. sec. 53-12-34 (1982); *Freeman v. Saxton*, 240 Ga. 309, 240 S.E.2d 708, 710 (1977).

of Ashford-Dunwoody Road. In 1965, he sold acreage south of I-285 for $10,250. In 1968, decedent made the Gearon sale of 149.6 acres, including part of the 102 acres, for consideration consisting of cash of $1,787,343.85 and three other tracts of land valued at $361,711.15, including the River Farm. Decedent received additional amounts in condemnation proceedings in 1971. Yet, decedent never kept an account of the proceeds he received from land sales and trades and condemnation proceedings. Nor is there evidence that he sought approval for his dealings from Kathleen or Weyman or even discussed the various transactions with them.

Moreover, in connection with the Gearon sale, decedent and Weyman signed in January 1969, affidavits stating that decedent's possession of all of land lot 347, which includes the Ashford-Dunwoody Farm, was "open," "public," "continuous," "exclusive," "peaceable," and "uninterrupted," and that from 1937 to 1968, decedent acted "in all respects" as the "sole owner" of the property and continued to act as sole owner of that part of the property not the subject of the Gearon sale (Ashford-Dunwoody Farm). These statements clearly show that no separation of legal title and beneficial interest with respect to Weyman's and Kathleen's remainder interest was intended by decedent and Weyman, but rather that decedent had for 30 years prior to the Gearon sale considered himself and held himself out to be the legal and beneficial owner of the Ashford-Dunwoody Farm, without objection or contradiction by his son. Indeed, none of decedent's acts or conduct suggests that he thought he had retained only legal title to the remainder interest in the 102 acres. Rather, he treated the entire property as his own and disposed of it in portions as he wished without interference from his children.

Likewise, nothing in Kathleen's or Weyman's behavior manifests an intention that a resulting trust exist between them and their father. After they signed the quitclaim deeds in 1956, neither Weyman nor Kathleen questioned decedent's actions with respect to the 102 acres or requested an accounting of land sales and reinvestment of proceeds. After decedent's death, Kathleen and Weyman took steps to sell the Ashford-Dunwoody Farm in accord-

ance with decedent's will, which directed that the rest of his estate be sold and the proceeds divided equally between Weyman and Kathleen. As executors of decedent's estate, Weyman and Kathleen included the Ashford-Dunwoody Farm (except the Weyman Spruill Homesite) in the gross estate on decedent's estate tax return as real property owned by him on the date of his death.

Petitioners argue, however, that the purpose of the quitclaim deeds was to enable decedent to sell or borrow on the property and that Kathleen and Weyman never intended to part with their interest under the 1931 deed but expected to inherit the Ashford-Dunwoody Farm at decedent's death. As to the events surrounding her signing the quitclaim deed, Kathleen testified:

my father came out of his room with the quit claim deed and said this is what we need to do so that I can sell some of this land if I have to.

* * * * * * *

I think he indicated that it was for the good of all of us that he needed to do that.

* * * * * * *

My understanding of what I was doing was allowing him to sell or borrow on the property if it was necessary and if he needed to do it. * * *

While her testimony may tend to show that decedent intended to obtain quitclaim deeds in order to sell some of the 102 acres and that Kathleen was willing to sign a deed enabling him to do so, it does not demonstrate a mutual understanding that decedent was to take legal title but was to have only a life estate in the property. Decedent's intention to sell part of the property and Kathleen's desire to help him sell or borrow on the property is as indicative of fee ownership as it is of a trust relationship, and petitioners have not presented sufficient evidence to show the latter.

In attempting to prove that the parties intended decedent to hold only a life estate with the beneficial interest in the remainder vested in Kathleen and Weyman, petitioners have stressed that Kathleen and Weyman did not intend to give up their "heritage" in the land but expected to receive the Ashford-Dunwoody Farm from decedent when he died. We recognize that Kathleen and Weyman may not have fully

understood what their interests were under the 1931 deed; however, we think that when they signed the quitclaim deeds, they intended to give their father all the interest they had in the 102 acres. They intended, we are convinced, to clear up the title to the property so that decedent, as sole owner, could do with the property whatever he wished to do.

Moreover, Kathleen's and Weyman's expectation of inheriting the land from decedent at his death does not amount to a mutual understanding that decedent was to receive no beneficial interest in the property. Kathleen and Weyman, as natural objects of decedent's bounty, understandably believed that their father would leave to them the bulk of his estate in his will, including the Ashford-Dunwoody Farm. However, mere hope and expectation do not transform a gift into a resulting trust. The Georgia Supreme Court has stated in a related context:

> an absolute gift will not be cut down by implication into a trust merely because the donor hoped and believed, at the time the gift was made, that the donee would share the beneficial interest of the property with him or with a third person. It must appear from the entire transaction that there is an obligation on the part of the holder of the legal title to hold it for the benefit of some one else. * * * [*Vickers v. Vickers*, 133 Ga. 383, 65 S.E. 885, 886 (1909).]

See also *Williams v. Thomas*, 200 Ga. 767, 38 S.E.2d 603, 608 (1946).

From the evidence presented before us, we conclude that petitioners have failed to show a mutual understanding between the parties that decedent was to hold legal title but no beneficial interest (other than a life estate) in the 102 acres. Because petitioners have not proved the existence of a resulting trust in favor of Weyman and Kathleen, the Ashford-Dunwoody Farm (apart from the two homesites) is includable in decedent's gross estate under section 2033.[20]

### (B) *The Kathleen Miers Homesite*

The opposite conclusion is required with respect to the Kathleen Miers Homesite. The facts and circumstances

---

[20]Petitioners have likewise failed to establish a factual predicate of their alternative theory that had decedent perpetrated a fraud on his children by entertaining a "surreptitious motive of eliminating the children's heritage in the land," then a constructive trust would exist in favor of Weyman and Kathleen. See Ga. Code Ann. sec. 53-12-26(2) (1982) reproduced above.

surrounding the transfer of title to the homesite to decedent indicate an understanding among Lewis, Kathleen, and decedent that decedent was to take legal title only so that he could secure a mortgage on the property to cover the $20,000 purchase price.

After decedent and Weyman completed construction of a house for Lewis and Kathleen, decedent transferred the homesite to them by warranty deed which recited a $20,000 consideration. Lewis and Kathleen fully expected to pay her father for the home, but after several inquiries, Lewis was not able to obtain financing. When decedent discovered that he could obtain financing from Decatur Federal, Lewis and Kathleen deeded the homesite back to decedent, who gave a security deed of the property to Decatur Federal covering a loan for $20,000. Each month, Lewis and Kathleen paid decedent an amount equal to the mortgage payments, and decedent made the payments to Decatur Federal. Nothing in the arrangement between the parties indicates that decedent intended to take any beneficial interest in the homesite. He thereafter exercised no control over the property.

In *Hancock v. Hancock*, 205 Ga. 684, 54 S.E.2d 385 (1949), a father, who because of his advanced age and poor health could not obtain financing to liquidate outstanding secured debts on 281 acres of realty, deeded 181 acres to his son who agreed to obtain a loan and reconvey the property to his father. After closing the two loans secured by the property, the son refused to reconvey the land and later conveyed the property to his wife. Under the facts, the Supreme Court of Georgia held that an implied constructive trust existed in favor of the father.[21] The court stated (54 S.E.2d at 389-390):

Bringing the illustration squarely within the facts of the present case, if A, a father, deeds land to B, a son, not upon a good and valuable consideration, though such consideration might be recited in the deed, but for the purpose of the son's obtaining a loan on the land and reconveying to the father, a resulting trust would arise in favor of the

---

[21]Because the son perpetrated a fraud on his father by refusing to reconvey the property and instead conveying it to his wife, the court found that an implied constructive trust existed in favor of the father. The court stated, however, that given the facts of the case it would make little difference whether the implied trust was in the nature of a resulting or a constructive trust. *Hancock v. Hancock*, 205 Ga. 684, 54 S.E.2d 385, 390 (1949).

father. *Simpson Grocery Co. v. Knight*, 148 Ga. 410, 96 S.E. 872; *Peppers v. Peppers*, 194 Ga. 10, 12, 20 S.E.2d 409. * * *

The instant case is analogous. Lewis and Kathleen deeded their homesite to decedent solely for the purpose of obtaining financing on the property. Although decedent did not reconvey the homesite to Lewis and Kathleen when he forgave the remainder of their indebtedness to him, notwithstanding her requests that he do so, he left the homesite to Kathleen in his will just as he had promised. While he held the title to the homesite, decedent enjoyed no beneficial interest in it. Kathleen explained that decedent may have delayed reconveying the homesite to them out of fear that Lewis and Kathleen would sell the homesite without consulting him. Considering the location of the homesite's .8695 acres within the 41-acre Ashford-Dunwoody Farm, such a concern would not have been unreasonable and does not amount to a beneficial interest in the property.

The facts before us clearly demonstrate a mutual understanding between decedent and Kathleen and Lewis that decedent take only legal title but no beneficial interest in the property for the sole purpose of obtaining a mortgage on the homesite.[22] As a resulting trust existed in favor of Lewis and Kathleen, the 0.8695-acre homesite on the Ashford-Dunwoody Farm was included by the executors in decedent's gross estate on the estate tax return in error.

### 2. *Weyman Spruill Homesite*

Respondent argues that the Weyman Spruill Homesite is includable in decedent's gross estate under section 2036(a)(1) as a transfer with a retained life interest. Section 2036(a)(1) provides:

SEC. 2036(a). GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

---

[22] We have found that, with respect to the Kathleen Miers Homesite, petitioners have presented evidence sufficient to meet both the preponderance of the evidence standard and the more stringent clear and convincing evidence standard. See note 18 *supra*.

(1) the possession or enjoyment of, or the right to the income from, the property * * *

Section 2036(a)(1) requires that the homesite be included in decedent's estate if he retained the actual possession or enjoyment thereof, even though he may have had no enforceable right to do so. *Estate of Rapelje v. Commissioner*, 73 T.C. 82, 86 (1979); *Estate of Honigman v. Commissioner*, 66 T.C. 1080, 1082 (1976). Possession or enjoyment is considered retained by the donor of a gift when there is an express or implied understanding to that effect among the parties at the time of the transfer. *Guynn v. United States*, 437 F.2d 1148, 1150 (4th Cir. 1971); *Estate of Rapelje v. Commissioner, supra* at 86.

In the instant case, there was no express agreement allowing decedent to retain possession and enjoyment of the homesite. In determining whether an implied agreement or understanding existed between the parties, we must consider all facts and circumstances surrounding the transfer and subsequent use of the property. In this connection, the courts have found two factors to be particularly significant: continued exclusive possession by the donor and the withholding of possession from the donee. *Guynn v. United States, supra* at 1150; *Estate of Rapelje v. Commissioner, supra* at 86-87. Neither of these factors is present in the instant case. Decedent and Georgia moved into the house where Weyman and Jennie had lived for 7 years, and they continued to live there after decedent and Georgia joined them. Weyman and Jennie continued to reside in the house for approximately 20 years after decedent transferred legal title to Weyman. At no time did decedent have exclusive possession of the property; at no time did he withhold possession from Weyman and Jennie.

In the intrafamily context, where the donor has not retained exclusive possession but co-occupies the residence with the donee, the courts have consistently rejected the applicability of section 2036 based solely on the family relationship without a showing of an express or implied agreement that the donor would have the right to continue to live in the residence. *Union Planters National Bank v. United States*, 361 F.2d 662, 667 (6th Cir. 1966); *Diehl v. United States*, an unreported case (W.D. Tenn. 1967, 21

AFTR2d 1607, 68-1 USTC par. 12,506); *Estate of Gutchess v. Commissioner*, 46 T.C. 554, 557 (1966). We have found no cases, and respondent has cited none, in which section 2036 has been applied to a decedent's transfer of legal title of a residence to his child, where the donor and donee thereafter co-occupy that residence until the decedent's death.

In *Diehl v. United States, supra*, the court held section 2036 inapplicable on similar facts. In that case, the decedent was 80 years old and in failing health when his wife died. After the wife's death, decedent's son and daughter-in-law sold their home and, with their children, moved in with the decedent. Seven months later the decedent deeded the residence to his son and daughter-in-law. Thereafter, the decedent continued to co-occupy the residence, contributing toward household expenses and paying utility bills until his death 9 years later. The court stated:

> We believe and so find that, though there was an assumption by all concerned that the father would continue to live in the residence, there was no agreement or understanding, express or implied, between the father and the son that the father would have the right to continue to live in the residence. [21 AFTR 2d at 1608, 68-1 USTC at 87,315.]

The instant facts support an even stronger case against the application of section 2036. Weyman and Jennie invested $4,000 to $5,000 of their savings in the late 1940's for the construction of the house after Weyman returned from military service in World War II; decedent paid the balance of the cost. In 1955, when decedent and his wife first moved into the house, Weyman and Jennie had been living in the home for at least 7 years, while decedent and Georgia had continued to live in their home on an adjoining site.

At that time, decedent planned to build a new home for himself and Georgia on the Ashford-Dunwoody Farm and intended to reside with Weyman only until the new home was built. Even after Georgia passed away 2 years later and his plans for building her a new house were abandoned, decedent considered constructing a new home for himself.

While Weyman and Jennie may have assumed that decedent would continue to live in the house after Georgia died, and in fact suggested that he stay with them rather than build a new house for himself alone, such an assump-

tion does not rise to the level of an implied agreement that decedent had retained the right to "possess or enjoy" the homesite.[23] On the contrary, Weyman testified that had decedent not been able to get along with Jennie, decedent would have had to leave. We have no reason to reject his testimony.

Based on the evidence presented before us in the instant case, we conclude that no agreement or understanding, express or implied, existed between decedent and Weyman with respect to decedent's continued occupancy of the homesite. Accordingly, we hold that the Weyman Spruill Homesite was properly excluded from decedent's gross estate.

### 3. *Valuation Issues*

Section 2031(a) provides that the value of decedent's gross estate includes "the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated." For purposes of section 2031(a), "value" means "fair market value," defined by the regulations as (sec. 20.2031-1(b), Estate Tax Regs.):

the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. * * *

The willing buyer and willing seller referred to in the above regulation are necessarily a "hypothetical buyer and seller having a reasonable knowledge of relevant facts." *United States v. Simmons*, 346 F.2d 213, 217 (5th Cir. 1965).

The notion of the "willing seller" as being hypothetical is also supported by the theory that the estate tax is an excise tax on the transfer of property at death and accordingly that the valuation is to be made as of the moment of death and is to be measured by the interest that passes, as contrasted with the interest held by the decedent before death or the interest held by the legatee after death. * * * [*Estate of Bright v. United States*, 658 F.2d 999, 1006 (5th Cir. 1981).]

With respect to the Ashford-Dunwoody Farm, our task is to determine the fair market value on the date of decedent's death of the property without the Weyman Spruill and Kathleen Miers Homesites which we have concluded were

---

[23]*Estate of Roemer v. Commissioner*, T.C. Memo. 1983-509.

not owned by decedent when he died. We may not assume, as respondent urges, that all three parcels would be marketed and sold as one 41-acre parcel, but must determine the includable property's value as if the homesites were owned by strangers. *Estate of Bright v. United States*, *supra* at 1002-1006.

Valuation is not an exact science and each case necessarily turns on its own particular facts. *Messing v. Commissioner*, 48 T.C. 502, 512 (1967). It is well settled that, in examining all the relevant facts and circumstances, events occurring subsequent to the valuation date are not considered in determining fair market value, except to the extent that such events were reasonably foreseeable on the valuation date—in estate tax cases, the date of the decedent's death. *Ithaca Trust Co. v. United States*, 279 U.S. 151, 155 (1929); *First National Bank of Kenosha v. United States*, 763 F.2d 891, 894 (7th Cir. 1985); *Estate of Van Horne v. Commissioner*, 720 F.2d 1114, 1116 (9th Cir. 1983), affg. 78 T.C. 728 (1982).

(A) *Ashford-Dunwoody Farm*

Based on the documents and the testimony of the experts and other witnesses, and relying on that evidence which we deem most persuasive, we have concluded and found as an ultimate fact that the Ashford-Dunwoody Farm had a fair market value of $7,304,664 ($190,000 per acre × 38.4456 acres) on October 5, 1980, the date of decedent's death.

(1) *Kenyon's Report.*—Petitioners' first expert witness, Kenyon, appraised the fair market value of the Ashford-Dunwoody Farm including the Kathleen Miers Homesite at $1,975,000 ($50,000 per acre × 39.5 acres). Kenyon's appraisal report dated March 17, 1981, had been attached to the estate tax return filed in that year; Kenyon reaffirmed his opinion at trial that the value of the property was $50,000 per acre on the date of death. Kenyon holds the designation of senior residential appraiser, was formerly an appraiser with the DeKalb County Board of Tax Assessors, and since 1972 has been in private practice appraising real estate in DeKalb and Gwinnett Counties.

In appraising the value of the Ashford-Dunwoody Farm, Kenyon used the "comparable sales" method[24] and concluded that the highest and best use of the property was "intensive office-institutional use" although such use would require rezoning. Kenyon's comparable sales consisted of six tracts of land varying in size from approximately 8.5 acres to approximately 54 acres, in price from $28,500[25] to $128,300 per acre and in date of sale from June 28, 1979, to January 28, 1981. Like the Ashford-Dunwoody Farm, five of Kenyon's six comparables required rezoning to meet the purchaser's needs and all five were sold subject to rezoning.[26] The rezoning of these five parcels from single family residential to office-institutional (O-I) and multifamily residential required lengthy and expensive litigation to obtain the change. The remaining comparable sale (at $128,300 per acre) consisted of property already zoned O-I and substantially developed.

Kenyon compared the Ashford-Dunwoody Farm favorably to the two comparable sales identified in his report as more valuable because of their location north of I-285, but assumed that the property could be rezoned only after lengthy and costly litigation such as that encountered in sales of the comparable properties. Thus, in reaching his appraised value of $50,000 per acre for the Ashford-Dunwoody Farm, Kenyon made an adjustment upward for its favorable location and an adjustment downward to reflect its unfavorable zoning.

---

[24]The "comparable sales" or "market data" approach involves gathering information on sales of property similar to the subject property, then comparing and weighing them to reach a value for the land being appraised. In the case of vacant, unimproved property (such as the Ashford-Dunwoody Farm) the comparable sales approach is "generally the most reliable method of valuation, the rationale being that the market place is the best indicator of value, based on the conflicting interests of many buyers and sellers." *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, affd. without published opinion 566 F.2d 1183 (9th Cir. 1977).

[25]Kenyon testified that when he learned of the sale to the Hines Interests at $505,000 per acre, he questioned his appraisal and reviewed his research with a "fine tooth comb." Although he found nothing that would lead him to believe that $50,000 per acre was not a fair appraisal, he noted that the contract for one of his comparable sales listed in his report at $28,500 was eventually sold for about $62,500.

[26]A sale subject to rezoning generally refers to a sale contingent on successful rezoning by the purchaser. If the purchaser fails to obtain the required zoning, his obligation to buy the property ceases and he may or may not be required to pay a penalty to the seller. Thus, the price of property sold subject to rezoning is likely to be higher than a sales price for the property "as is."

We have found little to criticize about Kenyon's expert opinion. His testimony at trial was credible and respondent failed on cross-examination to effectively challenge any aspect of Kenyon's report. We think, however, that Kenyon neglected to take into account the reasonable probability that the Ashford-Dunwoody Farm could be rezoned to O-I with relatively little difficulty.[27] Every other witness who testified as to rezoning possibilities, including real estate brokers, developers, appraisal and zoning experts, and the assistant director of the DeKalb County Planning Department, stated that on the date of decedent's death a reasonable probability existed that the property would be rezoned O-I to at least the prevailing density.

(2) *Ward's Report.*—Petitioners' second expert, V. Stuart Ward (Ward), appraised the fair market value of the Ashford-Dunwoody Farm excluding both the Weyman Spruill and the Kathleen Miers Homesites, at $6,120,000. Ward has been self-employed as a real estate appraiser since 1973, is a member of the American Institute of Real Estate Appraisers, and appraised the value of several properties in the vicinity of the Ashford-Dunwoody Farm between 1980 and 1983.

Ward incorporated by reference in his report the report of Dillard, Greer, Westmoreland, and Wilson (Dillard report), a firm experienced in zoning litigation, which concluded that as of the date of decedent's death a reasonable probability existed that the Ashford-Dunwoody Farm could be rezoned from residential to O-I at a 30-percent density level (12,600 square feet per acre). Ward concluded that the highest and best use of the property would be for a "comprehensively planned multi-use complex including office, retail commercial, motor hotel and/or multi-family accommodations."

Ward used the comparable sales method in appraising the value of the Ashford-Dunwoody Farm. Of 28 selected land transactions,[28] Ward chose six comparable sales to compare

---

[27]His report states:

"While in my opinion, a zoning change can eventually be obtained for the subject Spruill property, it will be done so only after lengthy and costly litigation as was the case in all sales. Therefore, the present value of the Spruill land is adversely affected by this prospect."

[28]Twenty-seven of the 28 transactions listed in Ward's report fell into eight categories or groups of transactions which represented sales and resales of all or parts of the same properties occurring between 1978 and 1984.

with the subject property ranging in price from $62,209 per acre for 23.18 acres sold in June 1980 to $278,293 per acre for 10.78 acres sold in January 1982.[29] All six comparable properties were zoned or sold subject to rezoning for uses "consistent with that anticipated" for the farm. After comparing each sale with the Ashford-Dunwoody Farm and adjusting for dissimilarities, Ward arrived at a preliminary figure of $200,000 per acre for the farm if "zoned as anticipated."[30] Ward then subtracted 2.6905 acres from the 38.4456-acre parcel (the Ashford-Dunwoody Farm without the homesites) which represented acreage rendered useless by the homesites (see appendix p. 1249), and appraised the farm at $7,151,020 (35.7551 acres × $200,000 per acre) if sold subject to rezoning.

Ward also computed the comparable sales prices in terms of dollars per square foot of building structure on the sites to reflect the density factor, concluding that the Ashford-Dunwoody Farm would have a value of $15 per square foot if it were zoned as anticipated. Ward also subtracted 2.6905 acres as useless land for purposes of this computation because of its proximity to the homesites and arrived at an appraised value for the farm of $7,266,225 (484,415 sq. ft. × $15 per sq. ft.) if sold subject to rezoning.

Rounding the figures produced by the two methods of computation, Ward concluded that $7.2 million represented the value of the farm subject to rezoning. Ward discounted this figure by 10 percent for cost and risk involved in rezoning and an additional factor of 5 percent for "reduced flexibility in land planning schemes" resulting from the omission of the homesites, and concluded that the Ashford-Dunwoody Farm had a value "as is" of $6,120,000 on the date of decedent's death.

We have found Ward's expert opinion particularly helpful in our analysis. While we realize that he had the benefit of considerable hindsight in preparing his appraisal, Ward's conclusion that the Ashford-Dunwoody Farm could be rezoned to O-I at the prevailing rate of 30 percent was well

---

[29]Although three of Ward's six comparable sales occurred after the valuation date, two of those three transactions occurred within 4 months after decedent's death.

[30]We interpret the phrase "zoned as anticipated" to refer to an O-I designation and approval for a 30-percent density level, as suggested by the Dillard report incorporated by reference in Ward's report.

supported by the Dillard report and several witnesses. In addition, Ward chose comparable sales which occurred prior to or a few months after the valuation date (October 5, 1980). Just as with Kenyon's testimony, respondent failed to discredit Ward's appraisal on cross-examination.

We think, however, that Ward exaggerated the negative effects of the exclusion of the homesites in arriving at his final figure. Ward first appraised the value of the Ashford-Dunwoody Farm without the homesites. He then subtracted an additional 2.69 acres which he considered as rendered useless by the exclusion of the homesites. Finally, he discounted the value by 10 percent to further reflect the disadvantage of purchasing the property without the homesites. While we appreciate the negative impact on the value of the property attributable to the exclusion of the homesites,[31] we would subtract no acreage but would apply a discount for this factor.

Ward further discounted the value of the Ashford-Dunwoody Farm by 5 percent to reflect the shift in costs and risk of rezoning from the seller (property sold subject to rezoning) to the purchaser (properly sold "as is"). While we agree that, in general, property sold subject to rezoning would command a higher price than property sold "as is," we accept Dillard's report that on October 5, 1980, a reasonable probability existed that the subject property could be rezoned to O-I at the then prevailing density.

For the adverse effects of both the homesites and the necessity of obtaining rezoning at the prevailing 30 percent density, we think a 5-percent discount is appropriate. Therefore, based on all the relevant facts and circumstances, we conclude that $200,000 per acre, discounted 5 percent to reflect the negative effect of the exclusion of the two homesites and the zoning problem ($190,000), represents the fair market value of the Ashford-Dunwoody Farm on October 5, 1980, the date of decedent's death.[32]

---

[31]Witnesses for petitioners and respondent testified that the value of the Ashford-Dunwoody Farm would be decreased, in some cases substantially, by the exclusion of the homesites. Charles Davidson, a vice president with the Hines Interests, testified that his company may not have purchased the Ashford-Dunwoody Farm had the Weyman Spruill Homesite not been included in the tract finally offered for sale.

[32]The fair market value for the entire 38.4456-acre tract is $7,304,664 ($190,000 $\times$ 38.4456).

(3) *Sale to Hines Interests as Fair Market Value.*— Respondent argues, however, that the price at which the Ashford-Dunwoody Farm sold to the Hines Interests on December 1, 1981 ($505,000 per acre), is the best evidence of the fair market value of the property on October 5, 1980. While subsequent events are generally not relevant in fixing a property's fair market value on a given date, the price set by a freely negotiated agreement made reasonably close to the valuation date is persuasive evidence of fair market value (*Ambassador Apartments, Inc. v. Commissioner*, 50 T.C. 236, 244 (1968), affd. per curiam 406 F.2d 288 (2d Cir. 1969); *Estate of Schroeder v. Commissioner*, 13 T.C. 259, 263 (1949)), except where a material change in circumstances occurs between the valuation date (herein the date of decedent's death) and the date of sale which renders the subsequent sale unforeseeable. See *Georgia Ketteman Trust v. Commissioner*, 86 T.C. 91, 101 (1986); *Estate of Loewenstein v. Commissioner*, 17 T.C. 60, 63-64 (1951); *Estate of Ridgely v. United States*, 180 Ct. Cl. 1220 (1967).[33]

We do not think that the sale to the Hines Interests at $505,000 per acre on December 1, 1981, represents the fair market value of the Ashford-Dunwoody Farm on October 5, 1980. The changes which occurred both nationally and locally in the real estate market during the 14 months following decedent's death could not have been reasonably foreseen at the time of decedent's death. In those months, land prices escalated rapidly in the Perimeter Center area due at least in part to national trends such as the legislative changes in the Economic Recovery Tax Act of 1981 (including liberalized depreciation allowances and the Accelerated Cost Recovery System) which favored real estate transactions and the increased use of limited partnership syndications to finance real estate ventures. Locally, improvements to the major thoroughfares in the Perimeter Center area and an increased demand for more intense use of land (higher density rezoning) contributed to the abrupt rise in land prices in 1981.

---

[33]Cf. *Estate of Shlensky v. Commissioner*, T.C. Memo. 1977-148 (parties agreed that no material change in circumstances had occurred between date of death and date of sale); *Estate of Ballas v. Commissioner*, T.C. Memo. 1975-103 (subsequent sale foreseeable under the circumstances).

Ward demonstrated this rise in land prices in the Perimeter Center area by grouping his 28 selected comparable property sales into nine categories, eight of which involved sales and resales of all or part of the same tract of land. For example, a 10.78-acre tract of land on Ashford-Dunwoody Road across I-285 from the subject property (part of the Brunette Spruill property) which sold for $28,500 per acre in June 1980[34] (4 months prior to the valuation date) was resold in January 1982 (1 month after the sale to the Hines Interests) for $278,293 per acre subject to rezoning, a 10-fold increase. Every witness who testified as to land prices during this period stated that land prices in the Perimeter Center area were rising in 1981.

Moreover, although rezoning the Ashford-Dunwoody Farm to O-I use at the prevailing density rate was a probable occurrence at the time of decedent's death, no prudent investor could have foreseen that the property would be rezoned to the high level of density eventually obtained by the Hines Interests, a level essential for the price paid by the Hines Interests. In October 1980, no developer had achieved or even approached a density level of 40,000 square feet; the prevailing average density level was 12,600 square feet per acre at the time.

Indeed, the pervasive attitude among real estate developers and brokers was one of caution where rezoning, and density level in particular, were concerned. Representatives of W.B. Johnson Properties, a developer which submitted a bid for the Ashford-Dunwoody Farm of $350,000 per acre subject to rezoning, and two developers which decided not to participate in the bid process, testified that their companies or clients would not have considered purchasing the property without a zoning contingency in the sales agreement. The particular risk facing W.B. Johnson Properties was not the O-I rezoning as such, but obtaining rezoning to the 35,000- to 40,000-square-foot density level necessary to make their proposed project "float." Other

---

[34] The 10.78-acre Brunette Spruill tract was sold in June 1980 for $28,500 per acre pursuant to a contract dated May 1978 subject to rezoning which had finally been obtained in April 1980. The purchaser of that tract also owned rights under a May 1978 contract to purchase the remainder of the Brunette Spruill property, a 23.18-acre tract directly across Ashford-Dunwoody Road from the 10.78-acre tract. In June 1980, the purchaser sold those rights for $62,209 per acre.

Atlanta brokers and developers agreed that purchasing unzoned real estate at that time with the hope of obtaining rezoning at the level of density required to construct an intensive commercial development, such as that planned and built by the Hines Interests, involved taking an unacceptable risk.

Nor do the facts in the record describe the Hines Interests as representative of a hypothetical willing buyer with reasonable knowledge of all the relevant facts. First, because we have concluded that the Weyman Spruill and Kathleen Miers Homesites are not included in decedent's gross estate, the issue is the price at which the Ashford-Dunwoody Farm would have changed hands between a willing buyer or seller assuming that the homesites were not for sale. The homesites would have seriously complicated development as well as rezoning at the needed density level. The Hines Interests paid $505,000 per acre for the farm with both homesites included and, according to a representative, might not have even considered purchasing the property had the homesites not been part of the bargain.

Second, the Hines Interests, a Houston-based developer which initially learned of the property's availability in July 1980, underestimated the community opposition to rezoning in the Perimeter Center area, and in particular, to requests for high density O-I rezoning, as well as the time and expense necessary to obtain such rezoning. Charles Davidson (Davidson), then project manager with the Hines Interests, testified that the developer had been "a little undereducated in * * * [its] assumptions about the achievable zoning," explaining that the interest cost alone caused by the rezoning delay between May 1982 and August 1982 was approximately $1 million.

Third, Davidson testified that the Hines Interests did not arrive at a bid price of $505,000 per acre by assessing or appraising the fair market value of the Ashford-Dunwoody Farm, but through a process of valuing the planned development as constructed, as leased, and as financed, with particular emphasis on the intrinsic value that the Hines Interests brings to a project as a result of its expertise as a developer. This method of valuation makes sense from the point of view of the Hines Interests.

However, the concept of a hypothetical willing buyer is not restricted to a particular developer or even a particular type of purchaser (*Estate of Bright v. United States*, 658 F.2d 999, 1006 (5th Cir. 1981)), and the method of valuation employed by the Hines Interests reflected factors peculiar to that developer.[35]

(4) *Dr. Wendt's Report.*—Respondent's argument that the sales price of the Ashford-Dunwoody Farm on December 1, 1981 ($505,000 per acre), represents the fair market value of the property on October 5, 1980, is based in part on the report and testimony of the Government's expert, Dr. Paul F. Wendt (Dr. Wendt). Dr. Wendt appraised the value of the property including both the Weyman Spruill and Kathleen Miers Homesites at $21 million ($503,597 per acre × 41.7 acres). Formerly a professor of real estate at the University of Georgia from 1970 to 1978 and a visiting professor at the University of California at Berkeley from 1978 to 1984, Dr. Wendt has since 1984 been associated as a valuation consultant with a former student in Berkeley, California. Dr. Wendt is a member of the American Institute of Real Estate Appraisers and has authored several publications on topics related to real estate appraisals and investment analysis.

Dr. Wendt's appraisal of the Ashford-Dunwoody Farm was based entirely on information obtained during the course of his employment with the Government, from March to June 1984 when his report was completed. Dr. Wendt spent a total of 7 days in May of that year in Atlanta conducting the field work for his appraisal. Dr. Wendt employed two valuation methods in appraising the value of the Ashford-Dunwoody Farm: the comparable sales method and the land residual value method.

Under his comparable sales approach, Dr. Wendt identified seven sales of comparable property *including* as a comparable the sale of the Ashford-Dunwoody Farm itself with the two homesites to the Hines Interests on December

---

[35]The facts also indicate that the closed bids process itself may have induced the Hines Interests to pay more for the Ashford-Dunwoody Farm than necessary. The Hines Interests' unconditional bid of $505,000 per acre exceeded the minimum bid specified in the offering by $155,000 per acre and exceeded the next highest bid, subject to several conditions, by $138,596 per acre. Only one of numerous individuals or companies identified by respondent as potential purchasers submitted a final bid and it was subject to a variety of conditions.

1, 1981, for a price of $505,000 per acre. The six comparable sales, other than the subject property, ranged in size from 8 to 27.30 acres, in price from $117,216 to $356,250 per acre, and in time from March 15, 1979, to March 2, 1983. Unlike the Ashford-Dunwoody Farm, all six comparable properties were zoned for O-I use at the time of the sale. Dr. Wendt selected the comparable properties on the principal criterion that, with respect to each property, permission had already been granted to develop the land to a set density level.

Dr. Wendt adjusted these comparable sales, as well as the sale of the subject property, upward to account for differences among the properties in market condition, location, size, and density level; the density factor was given double weight in Dr. Wendt's analysis. The resulting adjusted sales prices for the seven properties ranged from $361,094 to $614,224 per acre.[36]

We found Dr. Wendt's analysis under the comparable sales approach to be of little probative value in making our determination. Dr. Wendt's selection of comparable sales included only one sale prior to the valuation date, while two of his selected sales occurred as late as 1983, more than 2 years after the valuation date.[37] Dr. Wendt testified that he selected the later transactions in preference to earlier sales of the same properties[38] because the earlier sales were "not relevant to the computations that I wanted to make which illustrate the relationship of density to value." Dr. Wendt admittedly selected as comparable sales only those properties which were already zoned for development and had been granted permission for development to a particular level of density. His inclusion of the Ashford-Dunwoody Farm itself as a comparable is unprecedented.

---

[36]At trial, Dr. Wendt submitted a revised table of adjusted sales prices for the comparable properties with adjusted prices ranging from $260,480 to $656,770. The adjusted sales price of the subject property was $515,518 in Dr. Wendt's original table and $656,770 in the revised table.

[37]Eliminating the 1983 transactions and the sale of the Ashford-Dunwoody Farm itself, which clearly does not qualify as a "comparable" sale, reveals a range of sales prices among the remaining properties of $117,216 to $283,018 per acre.

[38]Dr. Wendt selected as one of his comparable sales the January 1982 sale of a portion of the Brunette Spruill property for $283,018 per acre without mentioning that the same tract sold for $28,500 per acre in June 1980 or that the contract to purchase another part of the same Brunette Spruill property sold for $62,209 per acre in June 1980 only 4 months before decedent's death. See note 34 and related text.

Dr. Wendt first assumed that each of the selected comparable properties had been granted the same high density as was obtained by the Hines Interests on the subject property, adjusted the sales prices of the comparable properties upward to a density level obtained by the Hines Interests, and gave the density factor a double weighting. Dr. Wendt's assumption that on October 5, 1980, a purchaser could expect to obtain a density level of 38,000 to 40,000 square feet per acre on the property, a density level more than 3 times the prevailing average at the time, is contrary to the views expressed by every knowledgeable witness who testified on the subject. This premise of his report is speculative at best.[39]

Furthermore, in making his upward adjustments to the comparable sales (including the subject property) with respect to four factors, Dr. Wendt failed to explain the method he used to devise the percentage rating system and to assign the particular rating to each property. For example, Dr. Wendt assigned a rating of 1 for the market condition factor to his comparable No. 5 and a rating of .50 to his comparable No. 1 with no explanation as to their meaning. Furthermore, he assigned the highest rating in each category to the subject property itself. Dr. Wendt admitted at trial and in his report that the adjustment measures he used were "subjective," "judgmental," and "based upon personal observation and knowledge."

Despite his reliance on the comparable sales approach as the preferred valuation method, Dr. Wendt ultimately concluded that no property comparable to the Ashford-Dunwoody Farm existed on the valuation date and that the sales price of the property on December 1, 1981, repre-

---

[39]Several witnesses testified on density level prospects but only two expressed any optimism about a higher density level than the prevailing rate. Hugh Vaughn, a real estate developer, testified that in October 1980 he would have anticipated obtaining a density level higher than the prevailing average but could not count on obtaining such density. Charles Coleman, assistant director of the DeKalb County Planning Department, testified that he would have recommended the Ashford-Dunwoody Farm for rezoning to O-I with a higher density level than the prevailing average, but that he could not give assurances as to the amount of excess density above the average which would be obtainable. In May 1981, in response to Woodward's inquiry with respect to rezoning, Coleman stated that rezoning the property to O-I would be no problem, but that the chances of obtaining a density level higher than that established in the area was unknown. In fact, although Coleman recommended the Hines Interests' high density rezoning plan to the Board in May 1982, the Board initially granted the requested zoning to O-I but denied the requested density of 40,000 sq. ft. per acre (3 times the prevailing average).

sented the best evidence of its fair market value on October 5, 1980.

Dr. Wendt based his opinion largely on information obtained directly from respondent's examining agent, much of which was reproduced verbatim in Dr. Wendt's report. He relied heavily on a schedule, provided by the examining agent and included in his expert report, listing offers allegedly made on the Ashford-Dunwoody Farm, and which was shown through testimony and documentary evidence to contain numerous errors and misstatements. Dr. Wendt also relied on, and quoted without verification in his report, statements attributed to prospective purchasers and Woodward, all of which were shown to have been provided by the examining agent. Dr. Wendt's unquestioning reliance on information provided by respondent tends to reveal his lack of preparation and independence in making his appraisal. We are not surprised that, despite evidence to the contrary, Dr. Wendt came to exactly the same conclusions with respect to the fair market value of the property as did respondent.

To supplement his valuation based on comparable sales, Dr. Wendt employed the land residual method. This method is essentially designed to show the maximum amount a developer could afford to pay for land, while earning a reasonable profit, after all costs of construction and operation are taken into account. Dr. Wendt estimated, for purposes of calculating land residual values, prospective density levels, anticipated construction costs, rental income, operating expenses, and returns on investments attributable to the building and applied a capitalization rate, producing land residual values ranging from $399,680 to $639,488 per acre.[40]

We regard Dr. Wendt's use of the land residual method of valuation in his expert report as purely an academic exercise. Dr. Wendt, himself, admitted that the method is "extremely flexible" and that "we can play all kinds of games and developers actually do with these kinds of numbers to determine what they may be willing to pay for

---

[40]In his land residual value analysis, just as in his comparable sales approach, Dr. Wendt assumed density levels in the 40,000-square-foot-per-acre range, again assuming that the high level of density obtained by the Hines Interests could be anticipated on Oct. 5, 1980.

a piece of property."[41] Indeed, Dr. Wendt's entire opinion of fair market value was admittedly based not on the price which a reasonably prudent investor would pay for the property but upon what a developer willing to take high risks would pay.

In summary, Dr. Wendt's analysis was based on biased, unsubstantiated, and erroneous information, as well as several basic assumptions contrary to the overwhelming evidence presented in this case. We find his opinion to be of little probative value in our determination.

(5) *Conclusion.*—Based on the relevant facts and circumstances, we find that the fair market value of the Ashford-Dunwoody Farm on October 5, 1980, was $7,304,664 ($190,000 per acre × 38.4456 acres).[42]

## (B) *River Farm*

We have found as an ultimate fact that the fair market value of the River Farm on October 5, 1980, the date of decedent's death, was $668,000.

Petitioners' expert witness, Kenyon, appraised the fair market value of the River Farm at $668,000 (approximately $3,500 per acre); his report dated March 17, 1981, was attached to the estate tax return. Kenyon's appraisal was based on the comparable sales method using sales in 1979 and 1980 of eight rather large acreage tracts (ranging from 73.492 to 168.39 acres) in the vicinity.

Richard Parks (Parks), a staff appraiser for the IRS, called by *petitioners* to testify at trial, conducted an informal appraisal of the River Farm in 1982 at the request of respondent's examining agent. Based upon an examination of over 22 comparable sales, Parks concluded that Kenyon's appraisal of the River Farm at $3,500 per acre was

---

[41]Petitioner's counsel demonstrated this game-playing on cross-examination by using Dr. Wendt's range of estimated rental income and construction costs to show that the land residual method could produce a value of *negative* $940,910 per acre.

[42]Petitioners argue that we must discount the fair market value of the Ashford-Dunwoody Farm to reflect a hypothetical cloud on the title resulting from the physical presence of Weyman and Kathleen on the property. We disagree. First, the presence of Weyman and Kathleen within the boundaries of the Ashford-Dunwoody Farm would not put a purchaser on notice of their claim to the property adverse to decedent's record ownership, as both Weyman and Kathleen owned and occupied their own homesites within those boundaries. Second, we have found above that on the date of decedent's death, Weyman and Kathleen did not claim ownership of the Ashford-Dunwoody Farm under the 1931 deed, but treated the land then and at all times prior, as belonging solely to their father.

"completely within reason and appropriately reflected market value."[43] When specifically asked by the examining agent to find the "upper limit of an acceptable value range" on the River Farm, Parks replied that "$4,000 per acre would reflect the upper value range to the subject property." Parks further concluded:

In the subject instance it is evident to this appraiser that the only valid reason for increasing the FMV [fair market value] of the property from $4,000 would be under the assumption that the tract was being valued as part of a specific assembledge [sic], in which case the subject could possibly increase in value to the $5,000 - $6,000 per acre range to a particular individual.[44]

Neither Kenyon nor Parks was cross-examined by respondent's counsel with respect to his opinion on the valuation of the River Farm, and we have no reason to question their reliability. Respondent offered no expert testimony as to the fair market value of the River Farm on the date of decedent's death and presented no additional evidence supporting his position. Joel Griffin, a real estate broker from 1971 to 1975, appeared as a witness for respondent and testified that in the mid-1970's decedent asked him to list the River Farm property at a price of $6,600 per acre, and "towards 1980" raised the price to $10,000 per acre, both prices which Griffen considered unrealistically high and, as described to the examining agent, "a joke."

In view of the lack of any relevant evidence to the contrary, we conclude that Kenyon's appraisal, as supported by Parks' testimony, is uncontroverted evidence of the fair market value of the River Farm on the date of decedent's death. We therefore find that the fair market value of the River Farm on October 5, 1980, was $668,000.

### 4. *The Fraud Issue*

Section 6653(b), in the form in which it was in effect when decedent's estate tax return was filed, calls for the imposition of a 50-percent addition to tax if any part of an underpayment is "due to fraud." For purposes of this section, fraud is the intentional commission of an act or

---

[43]Parks arrived at the same conclusion with respect to Kenyon's appraisal of the 23.09-acre Kimball Bridge Road property which had also been included in decedent's gross estate.

[44]Respondent determined the value of the River Farm to be $5,000 per acre.

acts for the specific purpose of evading a tax believed to be owing. *Webb v. Commissioner*, 394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; *Kotmair v. Commissioner*, 86 T.C. 1253, 1259 (1986). Fraud implies bad faith, intentional wrongdoing, and a sinister motive. It is never imputed or presumed. *Carter v. Campbell*, 264 F.2d 930, 935-936 (5th Cir. 1959); *Webb v. Commissioner, supra* at 377. Whether fraud has been committed is a question of fact to be determined from the entire record. *Grosshandler v. Commissioner*, 75 T.C. 1, 19 (1980); *Gajewski v. Commissioner*, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).

By statute, the burden rests with the Commissioner to prove affirmatively by clear and convincing evidence actual and intentional wrongdoing on the part of the taxpayer. Sec. 7454; *Webb v. Commissioner, supra* at 378. This burden may be met by showing that the taxpayer intended to evade taxes known to be owing by conduct designed to conceal, mislead, or otherwise prevent the collection of such taxes. *Stoltzfus v. United States*, 398 F.2d 1002, 1004 (3d Cir. 1968); *Rowlee v. Commissioner*, 80 T.C. 1111, 1123 (1983).

We find that respondent has failed to carry his burden. Respondent's whole fraud case is based on the proposition that the executors knowingly undervalued the Ashford-Dunwoody Farm with the specific intent of evading estate taxes. As we have discussed in deciding the valuation issue, the executors in filing the estate tax return were required to place a value on the Ashford-Dunwoody tract as of the date of decedent's death, the "exact moment of death," on October 5, 1980. *United States v. Simmons*, 346 F.2d 213, 218 n. 2 (5th Cir. 1965). In arriving at that value, they could appropriately take into account subsequent events, such as real estate developers' escalating interest in purchasing their property, only if those events and the changing conditions could have been reasonably foreseen on the date of decedent's death. *Georgia Ketteman Trust v. Commissioner*, 86 T.C. 91, 101 (1986); *Estate of Ridgely v. United States*, 180 Ct. Cl. 1220 (1967).

We do not think respondent has shown that the executors knew that the Kenyon report did not reflect a reasonable

appraisal of the property as of October 5, 1980, or that they used the valuation in the Kenyon report rather than some higher valuation with the specific intent of evading estate taxes.

(A) *The Kenyon Report Attached to the Estate Tax Return*

Although we have found that the value reported in the estate tax return was substantially less than the property's fair market value at decedent's death, there is no evidence of any effort to conceal from, or mislead, the IRS as to what the reported value reflected. The returned value reflected the written well-documented opinion of a widely experienced appraiser recommended to the executors by Davis, their attorney. A copy of Kenyon's report was attached to the estate tax return and it spelled out in detail the basis of his appraisal. It is difficult to believe that one committing fraud would attach to his return a full and complete explanation of what he was doing, especially where, as here, the value of a highly publicized piece of property was the issue. Cf. *Delone v. Commissioner*, 100 F.2d 507, 509 (3d Cir. 1938), revg. an order of this Court.

There is not a syllable of testimony suggesting that there was any connivance between Kenyon and the executors or any of their representatives on the preparation of his report or impugning in any way his integrity. Although we have found that the property had greater value than the reported amount, it is relevant that "There is no question upon which all persons, reasonable or otherwise, are so apt to differ as upon a question of value." *Penn v. Commissioner*, 219 F.2d 18, 20 (9th Cir. 1955), affg. a Memorandum Opinion of this Court.[45] By attaching Kenyon's report to the estate tax return, the executors explicitly and openly informed the IRS of the facts relied upon and the reasoning employed in arriving at the value of the Ashford-Dunwoody property. Nothing was concealed and no one could have been misled in this respect.

---

[45]Congress has addressed the issue of valuation understatements for purposes of the estate or gift taxes and has provided for additions to tax in sec. 6660.

(B) *Reliance on Advisors*

The record clearly shows, moreover, contrary to respondent's arguments, that Weyman and Kathleen had no reliable knowledge of land appraisals or the preparation of estate tax returns. In filing the estate tax return, they initiated nothing except the engagement of the lawyer and the accountant who had represented their father. They relied completely upon their advisors in valuing the Ashford-Dunwoody property on decedent's estate tax return.

Weyman had little business education or experience. He was employed most of his life by his father, running landscaping equipment and working on the family farm. Kathleen had spent her career working as a bank employee. Neither one of them had handled substantial land transactions or done any work involving the estate tax laws. Neither of them considered themselves competent to place a value on the Ashford-Dunwoody tract or to handle its sale.[46]

Upon their father's death, Weyman and Kathleen, as executors, turned to Davis, a lawyer who had served as attorney for their grandfather's estate, had revised their father's will, and had previously served as an attorney for the Spruill family for years, to handle the legal work required for the administration of decedent's estate. Davis was an experienced, respected lawyer. Pursuant to Davis' advice, the executors retained Kenyon to make an appraisal of the estate's real estate for use in filing the estate tax return. For the preparation of the estate tax return, they retained Birdsong, who had prepared decedent's and Weyman's tax returns for many years. In addition, they later employed Woodward to advise them on the handling of the sale of the Ashford-Dunwoody property.

The record is explicitly clear that the executors relied upon the advice they received from Davis, Kenyon, and Birdsong in reporting the value of the Ashford-Dunwoody property. Davis testified that "They were looking to me for

---

[46]Respondent makes the point that Weyman and Kathleen had seen their father become a millionaire by selling his land. This assertion overlooks the fact that most of decedent's land in the Ashford-Dunwoody Road area was sold in the Gearon sale for $14,500 per acre, approximately one-third of the value reported for the Ashford-Dunwoody Farm on the estate tax return.

the legal validity of their actions[,] in my judgment." Birdsong testified they "were relying on Mr. Davis and me" and that they followed their advice. Birdsong testified that he reviewed the Kenyon report, "accepted" it as "being well-founded, well-grounded," "a good appraisal." Although Davis advised the executors that the estate tax return would be examined by the IRS, he also told them Kenyon's appraisal "was a good appraisal." Neither Davis nor Birdsong ever considered not using the Kenyon report as a basis for the valuation in the estate tax return.

In *United States v. Boyle*, 469 U.S. 241 (1985), an executor argued that, because he relied on his attorney to file a timely return for the estate, the executor's failure to file a return on time was due to reasonable cause and that the estate was not, therefore, liable for the section 6651(a)(1) addition to tax for failure to file a return. The Supreme Court held that reliance on an agent does not excuse the failure to make a return but distinguished the failure to file a return from a taxpayer's reliance on the advice of his attorney on whether a return was necessary at all. As stated by the Supreme Court (469 U.S. at 251):

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," * * * would nullify the very purpose of seeking the advice of a presumed expert in the first place. * * * "Ordinary business care and prudence" does not demand such actions.

Although that case involved the addition to tax imposed under section 6651(a)(1) for failure to file a timely return, the principle is, in our judgment, equally applicable under section 6653(b) where fraud on the part of the taxpayer must be shown by clear and convincing evidence. See, e.g., *Jemison v. Commissioner*, 45 F.2d 4, 6 (5th Cir. 1930), revg. 13 B.T.A. 69 (1928); *Durovic v. Commissioner*, 54 T.C. 1364, 1398 (1970), affd. in part and revd. in part on other issues 487 F.2d 36 (7th Cir. 1973); *Rice v. Commissioner*, 14 T.C. 503, 507-508 (1950).

According to respondent, however, the executors "failed to make a complete disclosure to their advisors" and misled

them as to the value of the Ashford-Dunwoody property. At one point, respondent asserts that "Weyman and Kathleen deliberately insulated themselves from potential purchasers and discussions of value." Even so, respondent contends elsewhere in his brief, the executors "withheld pertinent information and knowledge from the appraiser and from the preparer of the estate tax return" and "chose not to disclose the offers they had received to their attorney or real estate broker."

This argument that the executors' return preparer and attorney were victims of the executors' deceit hardly comes with good grace. The record shows that the IRS recommended that the executors be prosecuted for filing an estate tax return containing a false statement (the value of the Ashford-Dunwoody Farm) in violation of section 7206(1) and that Davis and Birdsong be prosecuted on a charge of aiding and abetting and conspiring with the executors in filing such return in violation of section 7206(2). The Department of Justice declined to prosecute any of these individuals. Now, in the wake of damaged reputations, untold expense, and months of anguish, we are asked to accept the view that Weyman and Kathleen are the villains and that they misled the professionals, Davis, Birdsong, Kenyon, and Woodward, on the value of the Ashford-Dunwoody tract.

The facts do not bear out respondent's new theory. The Davis legal file shows that he received numerous telephone calls or held frequent conferences regarding the purchase of the property beginning on November 12, 1980, and continuing up to the date the estate tax return was filed. Davis knew of the intense interest in the property and, as he described developments, "prices exploded" in the Perimeter Center area between October 1980 and October 1981. In addition, Davis testified as to conversations with Weyman and Kathleen and with Woodward on the interest expressed by the several brokers on behalf of potential purchasers. We think it inconceivable that Weyman and Kathleen misled either Davis or Woodward as to the value of the property or that they could have done so if they had tried. Indeed, in May or early June 1981, before the estate tax return was filed, Kathleen provided Woodward with her file showing

contacts made with her and Weyman by possible purchasers of the property.

Birdsong, who actually prepared the estate tax return, relied upon the Kenyon appraisal—consistent with his practice of using a professional appraiser's values in completing estate tax returns during his entire accountancy career. Respondent contends that the executors should have informed Kenyon of the inquiries about purchasing the land that they had received and the Malcolm Powell offer. The executors would have been subject to adverse criticism, however, if they had attempted to influence Kenyon's views during the course of the preparation of his professional report. The courts have stated repeatedly that the best evidence of value is like and comparable sales within a reasonable time preceding the valuation date. *Onego Corp. v. United States*, 295 F.2d 461, 463 (10th Cir. 1961); *United States v. Johnson*, 285 F.2d 35, 40 (9th Cir. 1960).

(C) *Cooperation During the Investigation*

When the estate tax return investigation started, Davis advised the executors, Kenyon, Birdsong, and Woodward to cooperate fully with the IRS and give the agents the information they requested. Instead of relying on the attorney-client privilege, Davis, with the executors' consent, opened his file on the estate to the IRS agents; he kept meticulous records on conversations regarding the estate, and he was examined in court on practically every scrap of paper in his file. Birdsong opened his files and furnished the IRS agents with previous income and gift tax returns for decedent and Weyman that he had prepared over a period of approximately 15 years prior to decedent's death. Weyman and Kathleen submitted to interviews. This is not the kind of conduct that characterizes tax defrauders or reflects a feeling of guilt for having knowingly attempted to conceal facts or mislead the IRS. *Toledano v. Commissioner*, 362 F.2d 243, 247 (5th Cir. 1966), affg. in part and revg. in part a Memorandum Opinion of this Court; *Stratton v. Commissioner*, 54 T.C. 255, 287 (1970), supplemented by 54 T.C. 1351 (1970).

(D) *Conclusion.*

In summary, we conclude that the record does not show that Weyman and Kathleen as executors attempted, or intended, to defraud the Government. To the estate tax return they attached the Kenyon appraisal report showing openly and fully how the value used in the estate tax return was determined. They attempted to conceal neither the factual basis of the returned value nor the reasoning on which it was founded. Both their attorney and their accountant regarded the appraisal as a good one and advised its use in filing the return. The executors acted on that advice. They expected the return to be examined, and throughout the investigation they freely made available the testimony and the files of their advisors as well as the information that they had. The record simply does not show that any part of the underpayment was due to fraud within the meaning of section 6653(b).[47]

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

---

[47]Respondent contends that the attorneys' fees and executors' commissions incurred by the estate are not deductible on the ground that the executors fraudulently undervalued the Ashford-Dunwoody Farm. Because fraud has not been established, the attorneys' fees and executors' commissions are allowable. The amount thereof will be determined under a Rule 155 computation.

APPENDIX

ASHFORD–DUNWOODY FARM WITH TWO HOMESITES
41.7572 TOTAL ACRES