T.C. Memo. 2006-232

UNITED STATES TAX COURT

ESTATE OF F. WALLACE LANGER, DECEASED, CLARENCE D. LANGER, JR.,
EXECUTOR, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11116-04.                    Filed October 30, 2006.

<u>John H. Draneas</u>, for petitioner.

<u>Wesley F. McNamara</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Respondent determined a Federal estate tax
deficiency of $949,686 against the Estate of F. Wallace Langer

(the estate).[1]  After concessions,[2] the issue for decision is the fair market value on February 29, 2000, of Phases 2 and 5 of the Langer MarketPlace Planned Unit Development.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

F. Wallace Langer (decedent), a lifelong resident of Sherwood, Oregon, died on February 29, 2000 (the date of death). Decedent's nephew, Clarence D. Langer, Jr. (Clarence Langer), was appointed executor of the estate.  At the time the petition was filed, he resided in Sherwood, Oregon.

---

[1]  Amounts are rounded to the nearest dollar.

[2]  The parties have stipulated:  (1) The taxable estate will be increased by $127,802, representing the value of the residence included in the Langer Residence Revocable  Trust; (2) decedent's 29.19-percent interest in the Langer Family LLC (LFLLC) is included in the estate; (3) the fair market value of the real property owned by the LFLLC, excluding Phases 2 and 5 of the PUD and prior to reduction for deferred property taxes, was $5,885,000 on February 29, 2000; (4) the net value of the real property owned by LFLLC will be calculated by adding the fair market value of Phases 2 and 5 to $5,885,000, then subtracting $430,310 to account for property tax liabilities that would attach the property on the date of death; and (5) the value of decedent's 29.19-percent interest in LFLLC will be computed by multiplying the net value of the real estate owned by LFLLC by 15.32475 percent.  This computation reflects a 47.5-percent discount to account for all applicable discounts.  The figure thus computed will be substituted for the value of decedent's interest in LFLLC reported on Schedule G, Transfers During Decedent's Life, of the estate's Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return.

A.    The City of Sherwood

Sherwood, Oregon, is located approximately 15 miles southwest of Portland, Oregon.  During the 1990s and through at least 2000, Sherwood experienced rapid population growth, increasing from 5,320 in 1995 to 12,230 by 2000.

The population growth led to increased commercial development in the Town Center area, which was centered around the intersection of T-S Road and Pacific Highway.[3]  To facilitate commercial development, the City of Sherwood created a "master plan" for development, which included a comprehensive development plan, zoning districts, and a zoning map.  Individual land owners could apply for planned unit developments, or PUDs, which overlaid the master plan.  The PUDs included "categories of use", or phases, that fit within the general goals and requirements of the comprehensive plan.  The PUDs were intended to be flexible, offering relief from strict adherence to the zoning map.  The phases within each PUD could be altered without going through a comprehensive plan amendment or zoning change.  The PUD phases were not separate legal parcels, and any development, reconfiguration, or partitioning of the phases required the city's approval.

---

[3]  In 2000, Pacific Highway had two to three lanes of traffic running in each direction, additional turn lanes, and an average daily traffic count of 37,800.  In 2000, T-S Road had only one lane in each direction, a center turn lane, and an average daily traffic count of 22,946.

Prior to December 5, 2000, developers in Sherwood were subject to the traffic mitigation requirements of Metro, an elected regional government engaged in regional and local planning in the Greater Portland area. Traffic mitigation requirements could include constructing new roads, widening existing roads, or installing traffic signals. On December 5, 2000, Sherwood passed its own traffic mitigation ordinance, the Capacity Allocation Program (CAP). CAP's goal was to provide a better mechanism for transportation planning and more accurate calculations of infrastructure improvement costs.

Sherwood's continued growth and development were not without controversy. Around the date of decedent's death, many Sherwood citizens, including the mayor, showed some resistance to continued development. However, the resistence was insufficient to prohibit further development. By the date of death, new businesses in the Town Center area included a Home Depot, grocery stores, banks, restaurants, a movie theater, and an ice-skating arena.

B.   The Langer MarketPlace Planned Unit Development and the Langer Family Limited Liability Company

Since 1879, the Langer family owned and farmed land in Sherwood. Their land was located in the Town Center area, approximately a quarter mile east of Pacific Highway and bisected by T-S Road. As population and commercial development increased,

farming became less practicable, and the Langers turned their attention to commercial development.

In 1995, the Langers created the Langer MarketPlace Planned Unit Development (the Langer PUD), which defined the development permitted on a 55.59-acre tract owned by a trust for decedent and a contiguous 29.88-acre tract owned by a trust for Clarence Langer. While it did not create separate legal parcels, the Langer PUD divided the land into eight phases of development. On April 25, 1995, the Sherwood City Council approved the Langers' application for the PUD. However, the approval was conditioned upon their agreement to, among other things, develop parks, pedestrian walkways, and:

> At each phase of development, and with each site plan submitted to the City, the applicant shall provide a traffic impact analysis for City, County and ODOT [Oregon Department of Transportation] review and approval. Recommended traffic safety and road improvements shall be considered by the City and may be required with each phase.

By agreement dated May 9, 1998, decedent, Clarence Langer, and other members of the Langer family formed the Langer Family Limited Liability Company (LFLLC). The trusts for decedent and Clarence Langer contributed to LFLLC the land subject to the Langer PUD. At his death, decedent held a 29.19-percent interest in LFLLC.

Prior to decedent's death, LFLLC sold Phase 1 of the Langer PUD. On the date of death, LFLLC still owned Phases 2 through 8.

Because the parties stipulated their value, Phases 3, 4, 6, 7, and 8 are not at issue. See supra note 2. At decedent's death, Phase 2 was zoned retail commercial, was 2.48 acres, and had a rectangular configuration. Phase 5 was zoned retail commercial, was 11.7 acres, and had an awkward configuration. On the date of death, there were no deals pending regarding the development or sale of Phases 2 and 5.

In August 2000, LFLLC entered into negotiations with Target Corporation (Target) for the purchase of Phase 5. On December 5, 2000, LFLLC filed an application for development of Phase 5 with the City of Sherwood, which was approved in October 2001. Because the application was submitted before the CAP ordinance was enacted, the development of Phase 5 was subject to the traffic mitigation requirements of Metro.

After approval of the development application, Sherwood's mayor encouraged LFLLC to redesign the development of Phase 5. In 2002, LFLLC proposed an amendment to the Langer PUD and requested the approval of a new development plan for Phases 2, 3, and 5, which proposed changing the sizes and configurations of those phases. The amended PUD and new development plan were approved on November 12, 2002.

On September 12, 2003, LFLLC and Target signed a Sale and Purchase Agreement for the purchase by Target of approximately 10.97 acres of Phase 5. On July 8, 2004, LFLLC sold

approximately 3.01 acres of Phase 5 to Gramor Langer Farms LLC (Gramor).

C.   The Estate Tax Return

The estate timely filed a Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return (the estate tax return).  As reflected on the estate tax return, the estate valued LFLLC's real property at $8,180,000 as of the date of death and determined that the value of decedent's 29.19-percent interest in LFLLC, after all applicable discounts, was $837,000.

On April 2, 2004, respondent issued the estate a notice of deficiency.  Respondent determined that decedent's 29.19-percent interest in LFLLC was $2,606,700 rather than $837,000.  In response to the notice of deficiency, the estate filed a petition with this Court on June 28, 2004.

OPINION

For Federal estate tax purposes, property includable in the gross estate is generally included at its fair market value on the date of the decedent's death.  See secs. 2031(a) and 2032(a); sec. 20.2031-1(b), Estate Tax Regs.[4]  Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant

_____

[4] Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

facts." United States v. Cartwright, 411 U.S. 545, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs. The willing buyer and the willing seller are hypothetical persons, instead of specific individuals and entities, and the characteristics of these imaginary persons are not necessarily the same as the personal characteristics of the actual seller or a particular buyer. See Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981).

Real estate valuation is a question of fact to be resolved on the basis of the entire record. See Ahmanson Found. v. United States, 674 F.2d 761, 769 (9th Cir. 1981); Estate of Fawcett v. Commissioner, 64 T.C. 889, 898 (1975). The valuation must reflect the highest and best use to which the property could be put on the relevant valuation date. Symington v. Commissioner, 87 T.C. 892, 896 (1986).

Valuation is an inexact process. See Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980). As the trier of fact, we may use experts to assist us in deciding upon value, but we are not bound by those experts' views or opinions. See Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; Chiu v. Commissioner, 84 T.C. 722, 734 (1985). One expert may be persuasive on a particular element of valuation, and another expert may be persuasive on another element. See Parker v. Commissioner, 86

T.C. 547, 562 (1986).  Consequently, we may adopt some and reject other portions of expert reports or views.  See Helvering v. Natl. Grocery Co., 304 U.S. 282 (1938).

In attempting to establish the fair market value of Phases 2 and 5, the estate and respondent rely on valuation experts.  The estate's valuation expert, Brian L. Kelley (Mr. Kelley), also valued the subject land for purposes of preparing decedent's estate tax return.  Respondent's valuation expert was Stephen J. Pio (Mr. Pio).[5]  The experts agree that the highest and best use of Phases 2 and 5 on the date of death was their intended use, commercial development.  The experts also agree that the comparable sales method is the most appropriate valuation method.[6]  However, the experts disagree over the fair market values of Phases 2 and 5 on the date of death.  Mr. Kelley determined that Phases 2 and 5 had fair market values of $525,000 and $2,075,000, respectively.  Mr. Pio determined that Phases 2

_____

[5]  Because we find both experts to be qualified and because their relative experience does not impact our evaluation of their opinions, we do not discuss their qualifications or experience.

[6]  The comparable sales approach is "'generally the most reliable method of valuation, the rationale being that the market place is the best indicator of value, based on the conflicting interests of many buyers and sellers.'"  Estate of Spruill v. Commissioner, 88 T.C. 1197, 1229 n.24 (1987) (quoting Estate of Rabe v. Commissioner, T.C. Memo. 1975-26, affd. without published opinion 566 F.2d 1183 (9th Cir. 1977)).  This method requires gathering information on sales of property similar to the subject property, then comparing and weighing the information to reach a likely value for the land being appraised.

and 5 had fair market values of $620,000 and $3,420,000, respectively.

Both parties encourage us to reject the other party's expert report in its entirety. However, we find each expert to be persuasive on some points, but not on others, and give each report its due weight.

A.  Valuation of Phase 5

1.  Mr. Kelley's Report

Mr. Kelley purported to value Phase 5 by using the comparable sales method. However, after arriving at a value per square foot, he then applied a "discounted cashflow analysis" to arrive at Phase 5's "net present 'as-is' land value" on the date of death.

a.  Comparable Sales

To determine the value per square foot of Phase 5, Mr. Kelley used four comparables:

| Compar-able No. | Location | Sale date | Sales price | Acres | Adj. price per sq. ft.[1] |
|---|---|---|---|---|---|
| 1 | Intersection of Scholls-Sherwood Rd. and Pacific Highway, Sherwood, Oregon | 12/99 | $2,918,158 | 9.3 | $7.20 |
| 2 | 20260 Pacific Highway, Sherwood, Oregon | 8/00 | 4,473,194 (3,723,194 adjusted) | 24.35/ (12.18 usable) | 4.22/ (7.02 adjusted)[2] |
| 3 | NW 12th Ave. and Pacific Highway, Sherwood, Oregon | 9/96 | 1,097,705 | 7.3 | 3.81 |
| 4 | T-S Road and SW 90th Ave., Tualatin, Oregon | 6/96 | 3,353,310 | 15.46 | 5.54 |

[1] Because comparables 3 and 4 were sold 40 months and 43 months before the valuation date, respectively, Mr. Kelley adjusted the sales prices upward by 10.5 percent and 11.25 percent to account for inflation.  No such adjustments were made to comparables 1 and 2.

[2] Only a portion of comparable 2 was suitable for commercial development.  Mr. Kelley determined that "approximately 50 percent" of the site was zoned for exclusive farm use, which prohibited commercial development.  The seller of the property retained an option to repurchase that portion of the land for $400,000, though the option was never exercised.  The seller also retained and exercised an option to repurchase a pad site on the property for $350,000.  In order to get an "apples-to-apples" comparison, Mr. Kelley deducted $750,000, the total of the option prices, from the original sales price to get an adjusted sales price for the portion of usable land that was sold to and retained by the buyer.

Mr. Kelley determined that comparables 1 and 2 were high indicators of value because they were located on Pacific Highway, had superior exposure to traffic (exposure) than Phase 5, and were better configured for commercial development.[7]  He determined that comparable 3 was a low indicator due to the older sales date and inferior configuration.  Finally, he determined

[7] Both experts used the phrase "high indicator of value" to describe a comparable with a value greater than the property being valued and the phrase "low indicator of value" to describe a comparable with a value lower than the property being valued.

that comparable 4 was most similar to Phase 5 in exposure and location, but it was inferior in configuration and was thus a reasonable to slightly low indicator. Mr. Kelley concluded that Phase 5 had a value of $6 per square foot.

Comparables 3 and 4 were sold in 1996. In the period between those sales and the date of death, Sherwood experienced rapid population growth and increased demand for commercial property. Given the lapse in time and the change in demand for commercial property, we find that comparables 3 and 4 are not reliable indicators of value. Therefore, we take into consideration comparables 1 and 2 only.

### b. Discounted Cashflow Analysis

Mr. Kelley determined that Phase 5 was not readily marketable on the date of death and that it would take 3 years to sell the property. To account for "an extended marketing and due diligence period" and for "the risk associated with the subject property", Mr. Kelley applied a discounted cashflow analysis to Phase 5's value per square foot to arrive at its "net present 'as-is' land value" of $2,075,000.[8]

---

[8] Mr. Kelley's discounted cashflow analysis was essentially a three-step analysis: (1) He adjusted the value per square foot upwards by 3 percent annually for 3 years to account for inflation; (2) he then subtracted sales and marketing costs; and (3) he then discounted that amount by 12 percent annually for 3 years to account for the time-value of money and the risks associated with the property to arrive at a "net present 'as-is' land value".

We disagree with Mr. Kelley's use of a discounted cashflow analysis for two reasons. First, Mr. Kelley did not determine Phase 5's fair market value on the appropriate date--the date of death. Because we are determining fair market value on the date of death, it necessarily follows that the hypothetical sale between a willing buyer and a willing seller consummates on the date of death. See United States v. Cartwright, 411 U.S. at 551; sec. 20.2031-1(b), Estate Tax Regs. Mr. Kelley did not determine the price at which Phase 5 would change hands between a willing buyer and a willing seller on the date of death. Instead, he determined the price at which Phase 5 would change hands 3 years after the date of death and then discounted this amount by 12 percent annually for 3 years, as demonstrated by his testimony: "In my valuation analysis, I'm appraising it for a buyer that would most probably buy it three years from the date of valuation, because I didn't feel that it was really marketable at that point in time and therefore, I needed to discount that value over a 3-year period."

Second, we do not agree with Mr. Kelley's conclusions on which he based his use of a discounted cashflow analysis. By using a discounted cashflow analysis, Mr. Kelley attempted to reduce Phase 5's value to account for: (1) The uncertainty of offsite costs; (2) the City of Sherwood's stance on further

development; and (3) the purported oversupply of commercial property in Sherwood.

The uncertain offsite costs to which Mr. Kelley refers are the costs of traffic mitigation requirements imposed on commercial developers by Metro. However, these requirements were not peculiar to Phase 5--all commercial developers in Sherwood (or at least those developing larger tracts of land) were subject to the requirements of Metro, including the developers of comparables 1 and 2. Any impact the uncertain traffic mitigation costs had on the market should be reflected in the sales prices of comparables 1 and 2, and are thus taken into account by using those comparables in the comparable sale method. A further discount is not necessary.

The estate also argues that Phase 5 was subject to other extraordinary offsite costs. In valuing Phase 5, we generally take into consideration only those costs that are reasonably foreseeable by a hypothetical buyer and a hypothetical seller on the valuation date. See Estate of Spruill v. Commissioner, 88 T.C. 1197, 1228 (1987). The estate has not established that extraordinary offsite costs were reasonably foreseeable on the date of death. Instead, it appears that the estate is focusing on the costs associated with the reconfiguration of Phase 5 in 2002. However, the reconfiguration was not contemplated by LFLLC on or before the date of death, nor was it reasonably foreseeable

that such reconfiguration would be necessary.  Therefore, we do not take into account any purported extraordinary offsite costs.

Mr. Kelley and the estate assert that the City of Sherwood's hostility to further development made approval for additional development difficult and expensive.  Like the uncertain offsite costs, any impact the City's attitude toward development had on the market should be reflected in the sales prices of comparables 1 and 2 and is thus taken into account by using those comparables in the comparable sale method.  A further discount is not necessary.[9]

Finally, we do not agree with Mr. Kelley's determination that there was an oversupply of commercial space in Sherwood on the date of death.  In analyzing the supply and demand for commercial property, Mr. Kelley conducted a "retail expenditure analysis".  To summarize, Mr. Kelley determined that there were 9,218 people residing in 3,404 households within a 1.5-mile radius of the intersection of Pacific Highway and T-S Road. Using average retail expenditure data, he then determined that

[9] There is some indication that LFLLC had particular difficulty in getting city approval because of strained personal relationships between Clarence Langer and members of Sherwood's government.  Because we are determining the fair market value based on a hypothetical sale by a hypothetical seller, we do not necessarily take into consideration the personal characteristics of the actual seller.  See Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981).  Therefore, we do not factor in any difficulty arising from Clarence Langer's relationship with members of the city government.

3,404 households could support only 208,325 square feet of retail space. Because more than 300,000 square feet of commercial space was available on the date of death, Mr. Kelley concluded that there was an oversupply of commercial property.

By limiting his analysis to a 1.5-mile radius, Mr. Kelley made an implicit assumption that people living outside the radius will not shop within the radius. His approach takes into account only 9,218 people, which does not even include the entire population of Sherwood in 2000 (12,230). Mr. Kelley did not offer a reasonable explanation for why he so limited his analysis. The businesses within the area included a Home Depot, grocery stores, banks, restaurants, a movie theater, and an ice-skating arena. We find that it is unreasonable to assume that only those people living within 1.5 miles will frequent such businesses.

For the above-stated reasons, we reject Mr. Kelley's use of a discounted cashflow analysis.[10]

---

[10] We recognize that discounted cashflow analysis can be an appropriate valuation method. For example, discounted cashflow analysis has been accepted as a method of valuing a company's stock by determining the present value of its future stream of income. See, e.g., N. Trust Co. v. Commissioner, 87 T.C. 349, 378-380 (1986). Also, in Estate of Rodgers v. Commissioner, T.C. Memo. 1999-129, discounted cashflow analysis was accepted to determine the fair market value of multiple pieces of real property. The properties were so numerous that they could not be liquidated within a reasonable time without depressing the sales prices, and thus a discounted cashflow analysis was appropriate to take into account a market absorption rate. Id. This case is
(continued...)

## 2.   Mr. Pio's Report

In valuing the subject property, Mr. Pio made a "hypothetical assumption" that Phases 2 and 5 were legally partitioned on the date of death.[11]  He then determined the fair market value of Phase 5 using seven comparables:

---

[10](...continued)
distinguishable from Estate of Rodgers because there has been no showing that, due to their numerosity, the Phases could not be sold within a reasonable time without depressing their sales prices.  In fact, Mr. Kelley did not purport to use his discounted cashflow analysis to take into account a market absorption rate, nor does the estate argue that Mr. Kelley's discounted cashflow analysis was used to take into account a market absorption rate.

[11]   The estate argues that Mr. Pio's "hypothetical assumption" was inappropriate because Mr. Pio does not take into account costs associated with the subdivision of the phases for individual sale.  However, both parties valued Phases 2 and 5 as if they were separate properties on the date of death.  It does not appear that Mr. Kelley took into account the costs associated with the subdivision of the phases, nor does the estate offer an estimate of such costs.  Because the estate has failed to provide any basis upon which we could make an estimate, we cannot take such costs into consideration.

| Comparable No. | Location | Sale date | Sales price | Acres | Price per sq. ft. |
|---|---|---|---|---|---|
| 7 | NW Imbrie Rd. at NW Cornelius Pass Rd., Hillsboro, Oregon | 7/00 | $7,500,000 | 13.01 | $13.23 |
| 8 | SE 24th Ave at TV Hwy, Hillsboro, Oregon | 2/01 | 7,000,000 | 13.22 | 12.16 |
| 9 | NW Stucki Rd. at Cornell Rd., Hillsboro, Oregon | 2/00 | 8,276,240 | 17.67 | 10.75 |
| 10 | Intersection of Scholls-Sherwood Rd. and Pacific Highway, Sherwood, Oregon | 12/99 | 2,918,158 | 9.3 | 7.20 |
| 11 | 20260 Pacific Highway, Sherwood, Oregon | 7/00 | 4,473,194/ (4,373,194 adjusted) | 24.39/ (12.97 usable) | 4.22/ (7.74 adjusted)[1] |
| 12 | T-S Rd., between Adams Ave. and Langer Dr., Sherwood, Oregon | 9/03 | 2,702,160 | 10.93 | 5.68 |
| 13 | T-S Rd. at Langer Dr., Sherwood, Oregon | 7/04 | 1,500,000 | 3.01 | 11.44 |

[1] Mr. Pio adjusted the sales price of comparable 11 downward by $100,000 to account for the land zoned for exclusive farm use.

Mr. Pio determined that comparables 7, 8, and 9 were very high or high indicators of value due to their location and development costs, that comparable 10 was a reasonable indicator due to its modestly superior exposure but less desirable access, and that comparable 11 was a reasonable indicator due to its superior exposure but inferior zoning and less desirable access. Comparables 12 and 13 represented the sales portions of Phase 5, as reconfigured in 2002, to Target in 2003 and Gramor in 2004. Mr. Pio did not accord either comparable great weight. Mr. Pio

concluded that Phase 5 had a fair market value on the valuation date of $7.50 per square foot, or $3,420,000.

Mr. Pio acknowledged that Hillsboro was a completely different market with characteristics distinct from Sherwood. As such, we find that comparables 7, 8, and 9 are not reliable indicators of value. Likewise, comparables 12 or 13 are not reliable indicators of value. The sales occurred more than 3 years after the valuation date, and because of the reconfiguration, the character of the property was significantly different than it was on the date of death. Therefore, we take into consideration comparables 10 and 11 only.

3.  Fair Market Value of Phase 5

Mr. Kelley's comparable 1 was the same property as Mr. Pio's comparable 10 (comparable 1-10). Likewise, Mr. Kelley's comparable 2 was the same property as Mr. Pio's comparable 11 (comparable 2-11). Both comparables were located in the Town Center area of Sherwood, and the sales dates were within 6 months of the date of death. Thus, we find that comparables 1-10 and 2-11 are the most helpful in determining the fair market value of Phase 5. Based on the expert reports, we find that there are five major factors that must be weighed in comparing comparables 1-10 and 2-11 to Phase 5: Location, exposure, configuration, accessibility, and zoning.

### a. Comparable 1-10

Comparable 1-10 was located on Pacific Highway, while Phase 5 was located on T-S Road. Because Pacific Highway had a significantly higher traffic count than T-S Road, comparable 1-10 had superior location and exposure to Phase 5. While Mr. Pio did not address comparable 1-10's configuration, we agree with Mr. Kelley that comparable 1-10 had superior configuration for commercial development due to Phase 5's awkward configuration. These three factors indicate that comparable 1-10 is a high indicator of value.

The impact of accessibility is less clear. However, even assuming arguendo that Phase 5 had superior accessibility, this factor would not outweigh the three factors above. In addition, both Phase 5 and comparable 1-10 were zoned retail-commercial, making zoning a neutral factor. Thus, comparable 1-10, at $7.20 per square foot, is a high indicator of value.

### b. Comparable 2-11

Only a portion of comparable 2-11 was suitable for commercial development, the remainder being zoned for exclusive farm use. Both experts agree that the sale price of comparable 2-11 must be adjusted to determine the value of the area suitable for commercial development only. However, they do not agree to the extent of the adjustment. Additionally, their reports conflict regarding the acreage of the land usable for commercial

development. These issues must be resolved before a reliable comparison can be made.

Mr. Kelley valued the land zoned for exclusive farm use at $400,000, based on an option retained by the seller to repurchase that portion of the land. Mr. Pio testified that, hypothetically, if a buyer and seller believed that the land was worth $400,000, then $400,000 would be an appropriate value. However, Mr. Pio did not believe the land was actually worth $400,000. He concluded that it was worth $100,000, but did not offer any support for his conclusion other than that he "happened to be familiar with that property". Because the parties to the sale agreed to an option price of $400,000, we find that it is an appropriate measure of value for the exclusive farm use portion of comparable 2-11.

Mr. Kelley also reduced the sale price of comparable 2-11 by $350,000 to account for an option exercised by the seller to repurchase a 1.59-acre pad site on the property.[12] Mr. Pio did not make the adjustment because he was not aware that the seller retained and exercised the option. However, he testified that it would be appropriate to reduce the sale price by $350,000, so long as the acreage was also reduced by 1.59 acres.

---

[12] A pad site is a building site within a shopping area that is ready for construction of a retail establishment and is usually surrounded by customer parking areas.

We conclude that the sale price of comparable 2-11 should be reduced by $750,000, to reflect the exclusive farm use portion and additional pad site. Thus, we use an adjusted sale price for comparable 2-11 of $3,723,194.

Mr. Kelley determined that comparable 2-11 was 24.35 acres, and "approximately 50% of the site" was zoned for exclusive farm use. He used 12.18 acres (approximately 50 percent of 24.35) to calculate the adjusted sales price per square foot. Even though he deducted the option price of the pad site, he did not deduct the pad site's 1.59 acres from the usable acres.

Mr. Pio determined that comparable 2-11 was 24.39 acres, and 12.97 acres was usable. Mr. Pio's determination was based on a plot map and is thus more reliable than Mr. Kelley's approximation. From the 12.97 acres, we must also subtract the 1.59-acre pad site because we reduced the adjusted sale price by the pad site's option price. Thus, we find that 11.38 acres of comparable 2-11 was suitable for commercial development by the buyer, resulting in an adjusted sale price of $7.51 per square foot.

Because of its location on Pacific Highway, comparable 2-11 had superior location and exposure to Phase 5. It also had superior configuration due to its relatively square shape. Mr. Pio argues that these factors are offset by comparable 2-11's inferior accessibility and zoning. We disagree. As discussed

above, Phase 5's accessibility is unclear.  Even assuming arguendo that Phase 5 had superior accessibility, this would not offset the other three factors.  Additionally, comparable 2-11 was zoned light industrial instead of retail-commercial.  However, given the fact that comparable 2-11 was sold to Home Depot for the construction of a Home Depot store, we find that its zoning did not have a significant impact on the ability to develop the property.  Thus, comparable 2-11, at $7.51 per square foot, is a high indicator of value.

        c.    <u>Fair Market Value of Phase 5</u>

Due to the importance of the traffic count, we find that location and exposure are the most significant factors in determining Phase 5's fair market value.  In 2000, Pacific Highway had an average daily traffic count of 37,800, while T-S Road had an average daily traffic count of only 22,946.  Because of their location on Pacific Highway, comparables 1-10 and 2-11 had superior location and exposure to Phase 5.  Additionally, Phase 5 was less suitable for commercial development due to its awkward configuration.  To take these factors into consideration, we find that a 25-percent discount from the average sales price per square foot of the comparables is appropriate.  We conclude that Phase 5 had a value of $5.52 per square foot on the date of

death.[13]  Therefore, we find that the fair market value of Phase 5 on the date of death was $2,813,279.[14]

C.    Valuation of Phase 2

    1.    Mr. Kelley's Report

Similar to his valuation of Phase 5, Mr. Kelley used the comparable sales method to determine Phase 2's value per square foot ($6) and then applied a discounted cashflow analysis to arrive at Phase 2's "net present 'as-is' land value" on the date of death ($525,000).  For the same reasons described above, we reject the discounted cashflow analysis portion of Mr. Kelley's valuation.

To determine the value per square foot of Phase 2, Mr. Kelley used five comparables:

---

[13]  Phase 5's value per square foot on date of death = ($7.51 + $7.20)/2 = $7.36 [average sales price per square foot of comparables 1-10 and 2-11] x 0.75 [to reflect a 25-percent discount] = $5.52.

The estate argues that Phase 5's value should be reduced due to:  (1) The uncertainty of traffic mitigation costs imposed by Metro; (2) the city's hostility towards further development; and (3) the extraordinary offsite costs associated with making Phase 5 suitable for commercial development.  These arguments are discussed supra in our analysis of Mr. Kelley's discounted cashflow analysis.

[14]  $5.52 per square foot x 43,560 square feet per acre = $240,451 per acre x 11.7 acres = $2,813,279.

| Compar- able No. | Location | Sale date | Sales price | Acres | Adj. price per sq. ft.[1] |
|---|---|---|---|---|---|
| 1 | Edy Rd., Just West of Pacific Highway, Sherwood, Oregon | 6/99 | $775,404 | 3.03 | $5.87 |
| 2 | 19740 SW 72nd St., Tualatin, Oregon | 3/00 | 320,352 | 0.92 | 7.99 |
| 3 | Smith Blvd. at Pacific Highway, Sherwood, Oregon | 2/99 | 210,000 | 1.06 | 4.55 |
| 4 | Intersection of Sherwood Blvd. and Pacific Highway, Sherwood, Oregon | 11/97 | 349,919 | 0.95 | 9.05 |
| 5 | Intersection of T-S Rd. and Pacific Highway, Sherwood, Oregon | 3/97 | 660,000 | 2.46 | 6.71 |

[1] Because comparables 4 and 5 were sold 28 months and 36 months before the valuation date, respectively, Mr. Kelley adjusted the sales prices upward by 7 percent and 9 percent to account for appreciation and inflation. No such adjustments were made to comparables 1-3.

Mr. Kelley's expert report provided only a summary analysis of the comparables:

> The high end of the value range is indicated by Comparable 4 ($9.05/SF), a pad site with superior exposure. In concluding a value for the subject, primary emphasis is placed on Comparables 1 and 5 ($5.87/SF to $6.76/SF) both located in the immediate area. Considering the subject's secondary locational characteristics, a value of $6.00 per square foot is concluded for this phase of the subject property.

2. Mr. Pio's Report

Mr. Pio used six comparables to determine Phase 2's fair market value on the date of death:

| Comparable No.[1] | Location | Sale date | Sales price | Acres | Price per sq. ft. |
|---|---|---|---|---|---|
| 1 | Intersection of SW Handley St. and Pacific Highway, Sherwood, Oregon | 3/01 | $249,000 | 0.74 | $7.72 |
| 2 | 7300 SW Childs Rd., Tualatin, Oregon | 6/02 | $500,000 | 1.74 | $6.60 |
| 3 | 3585 NW 215th Ave., Hillsboro, Oregon | 8/99 | $485,000 | 2.83 | $3.93 |
| 4 | SW Borchers Dr., Just West of Pacific Highway, Sherwood, Oregon | 2/00 & 11/00 | $900,000 | 3.39 | $6.09 |
| 5 | Smith Blvd. at Pacific Highway, Sherwood, Oregon | 3/99 | $210,000 | 1.03 | $4.68 |
| 6 | Edy Rd., Just West of Pacific Highway, Sherwood, Oregon | 6/99 | $775,404 | 3.03 | $5.87 |

[1] Mr. Pio's comparables 5 and 6 are the same properties as Mr. Kelley's comparables 3 and 1, respectively. We note that Mr. Pio reported the sale date of his comparable 5 as March 1999, while Mr. Kelley reported the sale date of that property (his comparable 3) as February 1999.

In comparing the properties to Phase 2, Mr. Pio determined: (1) Comparable 1 was a high indicator of value because it had superior exposure than Phase 2 and was smaller in size, which indicated a relatively high value per square foot; (2) comparable 2 was a good to slightly high indicator of value due to its location in Tualatin; (3) comparable 3 was a low indicator of value because of inferior zoning and exposure; (4) comparable 4 was a good indicator of value because of similar location and exposure; (5) comparable 5 was a low indicator of value because, though it was located on Pacific Highway, it was away from most of the commercial development; and (6) comparable 6 was a good to

modestly high indicator of value; it had superior location and exposure, but inferior configuration and access.  Mr. Pio concluded:

> The preceding sales show a range in prices from $3.93 to $7.72.  Sale Nos. 1 and 2 ($7.72 and $6.60) are high indicators.  Sale Nos. 3 and 5 ($3.93 and $4.58) are low indicators.  Therefore, the subject value should be between these two price ranges, the mid-range of which is $5.64 per square foot.  The remaining sales are $5.87 and 6.09 per square foot, suggesting a value conclusion closer to the upper end of the range.  Based on the preceding, the value opinion is modestly above the mid-range, at $5.75 per square foot.  After applied to the total land area, the final value opinion for Subject Parcel Phase 2 is:
>
> 108,029 square feet x $5.75 = $621,167, Rounded $620,000.

### 3.  Fair Market Value of Phase 2

We accept Mr. Pio's valuation of Phase 2.  Mr. Kelley did not offer a detailed analysis of his comparables and did not further elaborate at trial.  On the other hand, Mr. Pio offered a detailed and reasonable comparison of each comparable to Phase 2.  We do not find that all of Mr. Pio's comparables are reliable indicators of value, particularly those not located in Sherwood.  However, the elimination of those comparables would not have a significant impact on the final value determination because $5.75 per square foot was in the range of the sales prices for the comparables located in Sherwood.  Therefore, we find that the fair market value of Phase 2 on the date of death was $620,000.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.